*In re* A.M. *et al.*, Minors (The People of the State of Illinois, Petitioners-Appellees, v. Marvin M., Respondent-Appellant).

First District (5th Division)    No. 1—96—3464

Opinion filed February 6, 1998.

David J. Boone, of Northbrook, for appellant.

Patrick T. Murphy, Lee Ann Lowder, and Maureen T. Duffy, all of Office of Public Guardian, for appellees A.M. and V.M.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Grauer, and Jennifer L. Wilson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HOURIHANE delivered the opinion of the court:

Following a hearing, the circuit court found respondent Marvin M. to be an unfit parent and terminated his parental rights to his two minor children, A.M. and V.M. Respondent appeals, contending that the finding that he was an unfit parent was not supported by clear and convincing evidence.

In 1991, the State filed petitions for adjudication of wardship alleging that A.M. and V.M. were neglected in that they were subjected to an injurious environment. The children were made wards of the court on January 22, 1992, and were placed in foster care with their maternal great-grandmother. On September 12, 1995, the children's mother signed a consent to have the children adopted by the foster mother. The State subsequently filed a petition alleging that respondent was an unfit parent within the meaning of the Adoption Act. 750 ILCS 50/1 *et seq.* (West 1996). Specifically, the State alleged that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to his children's welfare; failed to protect

his children from injurious conditions within their environment; and failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children or to make reasonable progress toward the return of the children to him within 12 months after the adjudication of neglect.

A parental fitness hearing as to Marvin M. was held on August 20, 1996. Jackie Green, a caseworker for the Department of Children and Family Services (DCFS), testified that she was assigned to the case between August 1991 and August 1993. She testified that Chicago Youth Center (CYC) was also assigned to the case and that Charles Martin was the caseworker from CYC. Green did not recall having any contact with respondent in 1991. The children's mother told her that respondent was incarcerated, but Green did not remember contacting him. Green added that it was the private agency's responsibility to contact respondent.

On February 11, 1992, there was an administrative case review (ACR), which respondent and Martin attended. At the ACR, parents are told the reason why the children were placed in the custody of DCFS and offered services if the parents indicate that they want their children back. The parents are also provided with the name and telephone number of the caseworker involved in the case. The service plan from that date indicated that the mother was attending parenting skills classes, with the hope of having A.M. and V.M. returned to her. The plan also indicated that respondent contacted Martin about gaining custody of his children. There was also a list of tasks to be completed as part of the service plan. The first task required CYC to coordinate weekly visits between respondent and the children at respondent's request. Respondent was also required to attend parenting skills classes, and he had specific tasks concerning his conduct during visits. Finally, the task sheet required respondent to submit to a psychological evaluation before the children were returned to him. Both the mother's and respondent's signatures appear on the first page of the service plan, and respondent indicated that he understood the tasks. Green testified that she had no knowledge that respondent completed the tasks in the service plan.

Charles Martin was the CYC caseworker assigned to the case between 1991 and 1993. He did not recall actually speaking to respondent at the February 11, 1992, ACR. Martin testified that if parents did not make themselves available for services, he would make a diligent search for them. He believed that respondent was incarcerated in mid-1992. Martin attempted to find respondent by talking to the mother and foster mother. However, he did not learn where respondent was incarcerated. Martin did not believe that respondent visited

the children while he was assigned to the case because there was no indication that such visits occurred.

Randee Jemc, a CYC caseworker, was assigned to the case in August 1993. He testified that he did not know respondent's whereabouts and had no contact with respondent until June 1994. Jemc made unsuccessful attempts to locate respondent by mail. He spoke to the foster mother every month and asked if she knew respondent's whereabouts. He gave business cards to the foster mother every month to give to respondent if he contacted her. On October 1, 1993, the foster mother told Jemc that she gave respondent Jemc's business card. On December 27, 1993, the foster mother reported that respondent stopped by on Christmas Day for about an hour. On February 10, 1994, Jemc evaluated the client service plan for the period between March 1993 and February 1994. Under respondent's task section, the plan provided that respondent's needs and interest in A.M. and V.M. would be assessed by CYC upon his release from jail and the appropriate services would be offered to him. A second task was to develop a service plan for respondent when he was released from jail. In February 1994 Jemc evaluated the performance of both tasks as unsatisfactory because respondent's whereabouts were unknown.

Jemc testified that he had no contact with respondent until June 1994. On July 25, 1994, Jemc evaluated the client service plan for February through July 1994 and gave respondent an unsatisfactory evaluation for all service tasks and visitation because respondent was not cooperating with the visitation plan and had just made his whereabouts known. Jemc testified that he believed respondent may have visited the children once between August 1993 and July 1994. Jemc sent respondent a "diligent search" letter in June 1994, and respondent telephoned him on July 28, 1994. During the conversation, respondent admitted he knew who Jemc was because he had already received information on how to contact him. Jemc told respondent he needed to complete a social assessment, which would determine what further services were needed. Respondent did complete the social assessment. Jemc said that parenting skills classes and a substance abuse assessment were still needed. Respondent was invited to an ACR on August 4, 1994, but respondent did not attend. At the ACR, the foster mother said that respondent came to visit the children but brought an "entourage" of family members with him. The foster mother requested that the number of people attending the visits be limited. The service plan from that ACR indicated that respondent should visit by himself to ensure a higher quality of visitation. On August 25, 1994, there was a visit with the children scheduled, but respondent did not attend.

On September 1, 1994, Jemc left a message for respondent to schedule a meeting. During a visit on September 6, 1994, the foster mother indicated that respondent said he was not visiting the children because he thought his visiting rights had been terminated. On November 8, 1994, the foster mother told Jemc that respondent "will not visit unless his family can also visit." Jemc established phone contact with respondent in December 1994 and made a home visit with respondent on January 20, 1995. Caseworker Arlana Goodall was also present at that home visit. At that time, respondent indicated that he wanted the mother to be reunited with the children and did not want to have the children because the foster mother would be angry. Respondent did not want the great-aunt to have custody of the children, and he gave Jemc the impression that if the mother could not obtain custody, he would want custody of the children.

In his February 9, 1995, evaluation, Jemc gave respondent a satisfactory rating for completing a social assessment, but an unsatisfactory rating for all other tasks. The evaluation indicated that Jemc met with respondent only once and that respondent had visited the children only once during the reporting period. On February 21, 1995, Jemc made a second home visit with respondent, along with Goodall, in which respondent said that he was working with Lutheran Social Services of Illinois (LSSI) to obtain the return of one of his other children. Jemc gave respondent a telephone number for parental stress and a referral for parenting skills. Jemc also asked respondent for verification of any services that he had completed, and respondent signed consents to allow Jemc to speak with his caseworker at LSSI. Jemc did not contact LSSI to verify respondent's participation because the caseworker who succeeded him had that responsibility. Respondent first said that he did not attend the August ACR because he had car trouble. During the same visit, respondent also said that he visited the children three times each month during the summer and that he forgot about the ACR in August. Jemc's notes mentioned that respondent seemed to have "excuses." Respondent also mentioned that he had been in prison, and Jemc told him he could have arranged for visits in prison. An ACR was held on February 24, 1995, but neither the parents nor the foster mother arrived at the DCFS office until after the review was completed.

In January 1995, Goodall was assigned to the case. When she reviewed the case file, she found no indication that respondent had been involved in services with CYC or any other agency. The file indicated that respondent had visited at the foster mother's home, but that there was conflict because of the other people that respon-

dent brought with him. Goodall was unable to determine how many times respondent visited the children between 1991 and 1995. There was no documentation of visits and she was uncertain why there was no documentation. Goodall and respondent discussed his intentions for the children's future. Respondent told Goodall that he had been visiting the children at the foster mother's residence, but the foster mother had stopped the visits because he brought too many people with him. Goodall arranged to have the visits occur at CYC. Goodall supervised a visit between respondent and the children in March 1995. Respondent brought his mother, his wife and his children to the visit. Respondent spent time playing with both children. Goodall testified that respondent completed five visits with the children between February and August 1995. She stated that the visits were scheduled once a month. Goodall stated that this rate of visitation was in compliance with the service plan. While she was assigned to the case, respondent was involved in parenting skills classes and had completed a psychological evaluation through LSSI. These services were offered to respondent to facilitate reunification with his other child, not these two children. However, Goodall did not want to duplicate the services being offered to respondent. Goodall stated that respondent never indicated to her that he had changed his intentions towards these two children.

The State published the case notes of Jeanine Jones from a September 12, 1995, court date. She noted that respondent had attended court that date and that the termination case had been continued because respondent "plans to contest even though he realizes the children are fine where they are, however he believes that if he gives up his rights to [the children] that it will adversely affect his chances to get his son."

Audrey Church was the caseworker from November 30, 1995, until December 27, 1995. She had no contact with respondent during that time. Church unsuccessfully attempted to contact him by letter and telephone to notify him of holiday parties for the children that the children wanted him to attend. Respondent did not attend any of the children's parties. All of the letters from Church were returned, stamped "addressee unknown."

Troy Galvach testified that he was the caseworker assigned to the case since January 1996. As of February 1996, respondent had had no visits with the children at CYC, and Galvach's first contact with respondent was in February. Respondent met with Galvach at an ACR. At this ACR, a new service plan was established, with visits scheduled to occur monthly on the last Tuesday of the month, from 4 p.m. to 5 p.m. at CYC. Respondent never visited the children at CYC

while Galvach was assigned to the case. At an ACR on August 7, 1996, respondent stated that he had been unable to visit the children because his mother had been ill. Respondent told Galvach that he was willing to visit either at CYC or at the foster home. Respondent said he had a problem with visits at the foster home because the foster mother did not want him to visit there. Galvach spoke with the foster mother about respondent's visits with the children, and she said that respondent visited three or four times in the preceding six months. Respondent said he visited them four to five times in the preceding six months. Galvach testified that one reason to require parents to visit at the agency is "to make a parent show a little effort visiting the child."

Galvach said that respondent had not completed all of the services in the service plan. He believed that respondent was supposed to be engaged in individual therapy. LSSI indicated that respondent had complied with all services needed to obtain custody of his other child and that some of these services overlapped with the services respondent needed to have these two children returned. Galvach did not consider the visitation rate of three to four times in six months consistent, but he considered five out of six visits to be consistent.

Warteen W. testified that she is the children's great-grandmother and foster mother. The children were placed with her in the summer of 1991. She did not know respondent at that time and first met him after his release from jail. She testified that she believed respondent had been in jail for two years. Respondent did not visit the children until two years after they were placed with her despite the fact that she told respondent he could visit the children anytime. Warteen testified that respondent visited the children four or five times accompanied by other members of his family. Other than those visits, she believed respondent visited about three or four times in her home. She recalled that respondent visited on Christmas Day in 1994 and 1995. During the preceding six months, respondent had visited the children twice in her home. Warteen said that all of respondent's visits were short ones. She also said that after the visits were changed to CYC, there were two occasions on which she took the children there, but respondent did not appear. The last time respondent saw the children was at his mother's funeral.

Loretta W. testified that she is the biological mother of the two children. Her relationship with respondent began in July 1987 and ended because they were on bad terms. She and respondent had many fights, one of which occurred at A.M.'s birthday party. On that occasion, Loretta and respondent both had knives, and the children were present. She put respondent in jail "lots of times," but added that she "just didn't go through with it."

Respondent was called as a witness by the State. He testified that he is the father of A.M. and V.M. He said that he was in jail in March 1990 and March 1991. Respondent also said he was on house arrest in January 1992. He did not visit the children while he was in jail. Since the children were placed with the foster mother, he had not made any child support payments to her. He recalled meeting with Jemc and discussing the service plan and visitation with Jemc at a January 1995 meeting at his home. Respondent recalled being present at the February 1992 ACR with his wife. Respondent said that he visited the children as often as he could and would have visited more if allowed. He said that he began visiting in April 1994 and continued visitation until February 1995. Respondent also testified that he did not know why CYC did not give him a specific date or time for visitation. He said that his wife grew up in the area near the foster parent's home and he visited the children while she visited her friends. When a conflict arose in February 1995, respondent contacted Goodall and had the visits moved to CYC. The last visit respondent attended at CYC was in August 1995, because Goodall left CYC and did not leave him the name of a caseworker to contact. Respondent testified that after Goodall left, he contacted CYC to set up visits in September and October and was told that there was no worker on the case. He said that because of the turnover of caseworkers, there were long periods between scheduled visits. Respondent began visiting at the foster home in September 1995 and visited the children every month from January 1996 until May 1996. After May, he did not visit because his mother was seriously ill and he was the only family member with a car. His mother died in July 1996 and he saw the children at the funeral. Respondent stated that because CYC never provided him with any services, he obtained the services through LSSI. According to respondent, he complied with all of the services except visitation, such as the social assessment, parenting skills classes and a psychological evaluation.

In rebuttal, the State called Vicky W., the children's maternal great-aunt. She resides in the home with the children. She testified that there were five visits scheduled at CYC, and she was present for all of the visits. Respondent did not show up for two of them, and they were cancelled. After August 1995, the next time respondent saw the children was on Christmas Day 1995. He brought toys and stayed about 30 minutes. He next saw the children in April 1996 at the foster home when he stopped by to pick up pictures. The next time he saw the children was at his mother's funeral in July 1996.

Also in rebuttal, the State published an emergency room medical report for respondent's current wife. The report showed that she had

many bruises from a fight with respondent, but she refused to talk to the police. Respondent denied fighting with her.

■ The unfitness of a parent must be proved by clear and convincing evidence. *In re Brown*, 86 Ill. 2d 147, 152 (1981). A finding of parental unfitness may be based on evidence sufficient to support any one statutory ground, even if the evidence is not sufficient to support the other grounds alleged. *In re C.R.*, 221 Ill. App. 3d 373, 378 (1991). A reviewing court will not substitute its judgment for that of the trial court when the trial court's decision is clearly supported by the record, but reversal is required when the trial court's decision is contrary to the manifest weight of the evidence. *In re L.N.*, 278 Ill. App. 3d 46, 49 (1996). The rationale underlying this standard is that the trial court's opportunity to view and evaluate the parties and their testimony is superior to that of a reviewing court. *Brown*, 86 Ill. 2d at 152. Accordingly, the trial court's findings should be given great deference. *Brown*, 86 Ill. 2d at 152. Each case concerning parental unfitness is *sui generis* (*In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)), and factual comparisons between cases are of little value (*In re S.J.*, 233 Ill. App. 3d 88, 113 (1992)).

■ In order to find a parent unfit under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 1996)), the trial court must find by clear and convincing evidence that the parent " 'fail[ed] to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare.' " *Syck*, 138 Ill. 2d at 273-74, quoting *In re Paul*, 101 Ill. 2d 345, 352 (1984). Our supreme court has stated:

"[I]n determining whether a parent showed reasonable concern, interest or responsibility as to a child's welfare, we have to examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. Circumstances that warrant consideration when deciding whether a parent's failure to personally visit his or her child establishes a lack of reasonable interest, concern or responsibility as to the child's welfare include the parent's difficulty in obtaining transportation to the child's residence [citations], the parent's poverty [citation], the actions and statements of others that hinder or discourage visitation [citation], and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference to, and lack of concern for, the child [citation]. If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child *** may demonstrate a reasonable degree of concern, interest and responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances. [Citations.] *** [A] court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts." *Syck*, 138 Ill. 2d at 278-79.

■ The record establishes that respondent was incarcerated prior to the time the children were first removed from the mother's home by DCFS until the beginning of 1992, which would explain why he was not visiting the children at that time. We are aware that respondent's periods of incarceration severely restricted his ability to demonstrate concern for his children, but some effort towards that end should have been made. See *In re T.D.*, 268 Ill. App. 3d 239, 248 (1994). Respondent attended an ACR within one month of his release from prison but missed others. He sometimes visited the children at the foster parent's home and visited three times at CYC. Respondent did not attend every scheduled visit and offered various excuses for his absences.

The issue is whether he maintained concern, interest and responsibility as to his children's welfare that, under the circumstances, "was of a reasonable degree." (Emphasis omitted.) *Syck*, 138 Ill. 2d at 280. The record reflects that respondent had four other children besides A.M. and V.M., had remarried, and was seeking custody of another of his children who was in DCFS custody. Although the record also shows that there was some turnover in caseworkers at CYC, the trial court reasonably could have concluded that respondent's failure to attend visits there resulted from his own indifference rather than difficulties attributable to the turnover in personnel. There is some evidence that when there was no worker on the case, respondent resumed his sporadic visitation with the children at the foster parent's home. However, we do not believe that respondent's efforts show a reasonable degree of concern, interest and responsibility as to his children's welfare. The first 2½ years the children were in DCFS custody, respondent did not visit them at all, even after he was made aware that they were in foster care. Respondent did give the children gifts at Christmas and sometimes money for birthdays. However, when he visited them, he stayed for only 15 to 30 minutes. There was no evidence that he ever called the children or sent them cards or letters. By his own testimony, he usually visited the children when his wife was visiting her friends. He did not attend most of the scheduled visits and did not fully comply with services offered by CYC, although he had complied with services through LSSI for the return of his other child. Respondent's efforts to communicate with and show interest in his children were minimal, at best. The trial court did not err in finding him unfit and terminating his parental rights.

Because a finding of parental unfitness may be based on evidence to support any one statutory ground, we decline to address respondent's other arguments. See *In re C.R.*, 221 Ill. App. 3d 373 (1991).

626

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

HOFFMAN, P.J., and HARTMAN, J., concur.