*In re* ADOPTION OF G.L.G., a Minor (M.R.G., Plaintiff-Appellant, v. M.C., Defendant-Appellee).

Second District  No. 2—99—0151

Opinion filed September 29, 1999.

Carl W. Gilmore, of Mohr, Mangiamele, Bruce & Gilmore, of McHenry, for appellant.

No brief filed for appellee.

Camille A. Goodwin, of Woodstock, guardian *ad litem*.

JUSTICE GEIGER delivered the opinion of the court:

The plaintiff, M.R.G., appeals from the June 26, 1998, order of the circuit court of McHenry County finding the defendant, M.C., who is the biological father of G.L.G., a minor, not unfit. The plaintiff also appeals from the trial court's January 11, 1999, order dismissing her adoption petition and ruling that she lacked standing to proceed to a custody hearing pursuant to section 20 of the Adoption Act after the adoption petition had been denied (750 ILCS 50/20 (West 1994)). For the reasons that follow, we reverse the trial court's order of June 26, 1998, vacate the trial court's January 11, 1999, order, and remand the cause for further proceedings on the adoption petition.

On October 28, 1996, the plaintiff filed her petition to "adopt related child." In her petition, the plaintiff alleged that the child to be adopted, G.L.G., was born on July 23, 1995, to Gretchen G., who had died on October 17, 1996. The plaintiff was Gretchen's sister. The plaintiff alleged that the defendant had been adjudicated the biological father of G.L.G. by default on January 5, 1996, but that he had failed to show a reasonable degree of interest in G.L.G. within 30 days of her birth. The plaintiff also alleged that the defendant had failed and refused to contribute toward the support of G.L.G. and that he had no contacts with G.L.G. for over 1½ years. The plaintiff alleged that it was in the best interest of G.L.G. that the plaintiff adopt G.L.G. As

amended, the petition further alleged that the defendant was an unfit parent because of his abandonment of G.L.G. and because of his desertion of G.L.G. for more than three months next preceding the filing of the adoption petition.

The plaintiff attached as an exhibit to her petition a copy of the default parentage order for support entered by the circuit court of McHenry County on January 5, 1996, which ordered the defendant to pay $100 per month in current child support for G.L.G. to the Illinois Department of Public Aid (IDPA). Also attached was a copy of the October 18, 1996, order of the circuit court of McHenry County appointing the plaintiff as temporary guardian of G.L.G.

At a hearing on October 31, 1996, the trial court entered an order appointing Camille Goodwin guardian *ad litem* of G.L.G. On that same day, the defendant entered his *pro se* appearance.

On November 14, 1996, the defendant, now represented by counsel, filed his "motion to dismiss guardianship; motion to recall warrant and set aside finding of contempt; and motion to dismiss the related adoption petition or in the alternative appoint counsel and place the minor in defendant's custody." In his motion to dismiss the related adoption petition, the defendant alleged that Gretchen and the plaintiff were not sisters and that they had different mothers and fathers. The defendant further alleged that the adoption petition should be dismissed because a petition to adopt a nonrelated child requires that the child be "available for adoption." The defendant also alleged that the plaintiff did not have standing to bring a custody action because the defendant had never consented to her having physical custody of G.L.G. and that the plaintiff had obtained custody only through fortuitous circumstances.

On November 27, 1996, the plaintiff filed her motion to strike the defendant's motion to dismiss filed on November 14, 1996. In her motion, the plaintiff alleged that Gretchen and the plaintiff were sisters related by blood. The plaintiff attached as exhibits to her motion copies of the birth certificates of the plaintiff and Gretchen. The trial court granted the plaintiff's motion to strike on March 14, 1997.

On December 20, 1996, the defendant filed his response to the petition for adoption, denying all material allegations. On that same day, the defendant also filed his *pro se* motion for visitation with G.L.G.

On April 11, 1997, the plaintiff filed a motion for blood tests, alleging that information had come to light casting doubt on the identity of the biological father and that DNA testing should be ordered. On May 2, 1997, the trial court entered an order compelling the defendant to submit to blood tests for DNA analysis.

On July 10, 1997, the defendant filed his motion to vacate

guardianship and petition for custody. In his motion, the defendant alleged that he had been traveling four hours each way to visit with G.L.G. and that he had acted in her best interest in attempting a gradual transition from the guardian's care to his care. He also alleged that he had been "deterred from establishing a bond with his daughter" under the plaintiff's guardianship.

Following a hearing on July 18, 1997, the trial court entered an order establishing the paternity of G.L.G., noting the defendant's admission of paternity and the DNA testing. The record reflects that the DNA parentage test results indicated that the probability of the defendant's paternity of G.L.G. was 99.96%.

On November 12, 1997, following a hearing, the trial court entered an order vacating the temporary guardianship order of October 18, 1996. The trial court further ordered that the plaintiff "return" G.L.G. to the defendant.

The trial court conducted a fitness hearing on May 28, 1998, in accordance with section 8(a)(1) of the Adoption Act (750 ILCS 50/8(a)(1) (West 1994)). At the hearing, Richard Button testified on behalf of the plaintiff. Button testified that Gretchen was his fiancée. They met in 1995 before G.L.G. was born and then began dating on August 9, 1995. They then resided together, with G.L.G., in Woodstock from late in October or early in November 1995 until Gretchen passed away on October 17, 1996. During that time period, they moved to three different residences.

Button testified that Gretchen had taken G.L.G. to visit the defendant in Keithsburg on one occasion but the defendant never visited G.L.G. in Woodstock. The defendant never telephoned or sent cards or letters during the time that Button resided with Gretchen, although she sent cards and telephoned the defendant. The defendant never provided any financial support for G.L.G. during that time. The defendant was aware of Gretchen's address because Gretchen had given it to him and because Gretchen had instituted court proceedings against the defendant for child support.

Amy Carlson also testified on behalf of the plaintiff. Carlson was a friend of Gretchen and lived with her in Keithsburg from August 1994 through January 1995. Gretchen and the defendant began seeing each other at the end of September or beginning of October 1994. Gretchen discovered that she was pregnant with G.L.G. in the middle of October 1994. Gretchen and the defendant continued dating until January 1995, at which time Gretchen moved to Woodstock. Carlson went with Gretchen to her doctor appointments during the pregnancy and was with her in the hospital after G.L.G. was born. The defendant did not attend any of these appointments and was not present for the birth.

Carlson drove Gretchen and G.L.G. to Keithsburg at the end of September 1995. Carlson took them to the house where the defendant was living at that time. No advance arrangements had been made for the visitation, which was a surprise. They visited for approximately three to four hours. During the visitation, the defendant held, fed, and played with G.L.G. There were no further visits between the defendant and G.L.G.

The plaintiff testified on her own behalf. She testified that she resided in Hebron and that Gretchen was her sister. She had known the defendant since September 1994, when Gretchen introduced him as her boyfriend. Prior to Gretchen's death, the plaintiff had seen him approximately three times.

The plaintiff testified that she spoke with the defendant's sister-in-law, Nila C., on the day that Gretchen died. They did not discuss the defendant. The following day, the plaintiff was granted a temporary guardianship of G.L.G.

The plaintiff called the defendant as an adverse witness. The defendant testified that he was 20 years old and that he resided in Keithsburg. At the time of the hearing, he was employed at a bakery. He testified that he was found to be the father of G.L.G. by default order on January 5, 1996. He became aware of the paternity proceedings in December 1995 but did nothing to become involved. He never paid any pregnancy or delivery expenses.

He testified that he learned of G.L.G.'s birth from Nila C. but he did nothing for G.L.G. at that time. He made no attempts to locate Gretchen in Woodstock after G.L.G. was born, although he was aware that Nila had contact with Gretchen. He acknowledged that he visited Gretchen in Woodstock prior to G.L.G.'s birth but had no conversations with Gretchen regarding future contact with G.L.G.

The defendant testified that he did not sign G.L.G.'s birth certificate. He did not visit her in the hospital and did not send a card or flowers. He admitted that he did nothing at the time of her birth to indicate that he was G.L.G.'s father. He made no child support payments, with the exception of the forfeiture of a $200 bond he posted after a contempt petition was filed against him for the nonpayment of support. He also admitted that he never made any future plans with respect to G.L.G. Despite being instructed by the police in January 1995 not to see Gretchen because he was underage, he acknowledged that he continued to do so.

The defendant testified that, between the date of G.L.G.'s birth and the date of Gretchen's death, he visited with G.L.G. once, which occurred during Labor Day weekend in 1995. He did not arrange for the visit. During the visit, he did not ask about G.L.G.'s living ar-

rangements and did not ask Gretchen for her address. He did not discuss with Gretchen any arrangements for future visitations.

He testified that, from the date of G.L.G.'s birth to the date of Gretchen's death, he had a driver's license and access to a telephone. Prior to Gretchen's death, he never sent any cards or made any telephone calls to G.L.G. He acknowledged that he had received a Christmas card from Gretchen in 1995.

The defendant testified that he received $6,048 in social security benefits in 1995, and $3,192 in 1996 and 1997. His mother, however, spent part of the money and gave him between $100 to $200 per month, which he used for rent. He worked as a laborer 20 to 30 hours per week during the summers in 1995 and 1996. He continued to work part time between the summer of 1995 and January 1996. He was also employed from March 5, 1997, through January 23, 1998. He dropped out of high school in February 1998.

Keithsburg Chief of Police Steven McGuire testified on behalf of the defendant. On January 21, 1995, he had interviewed the defendant and Gretchen during the course of an unrelated criminal investigation. At that time, Chief McGuire advised the defendant and Gretchen that if he became aware in the future that they had sexual intercourse again, he would "file charges on them." Chief McGuire testified that the State's Attorney had reviewed the matter and decided not to prosecute.

The defendant also testified on his own behalf. He testified that he attended high school through his senior year and was in mainstream classes. He did not complete high school because the superintendent advised him that he would be expelled for "causing too much trouble." He did not believe he had any type of learning disability. His mother had a drinking problem for a year or two, and his father was deceased. He never had any criminal problems other than traffic violations.

He testified that, after the meeting with Chief McGuire, he did not attempt to speak with Gretchen because he had been ordered not to. After the meeting, Gretchen was angry and was "slamming stuff around the house." He testified that he offered to help her with the pregnancy at that time but she ignored him and "stormed out of the house." He testified that he did not expect to see her again after that meeting. He admitted that he received letters and cards from Gretchen but that he did not answer the letters because he had no idea where she was staying.

After G.L.G. was born, he gathered together toys but did not know how to forward the items to her. He admitted that he did not attempt to learn where G.L.G. was living except for asking Nila, who would not divulge the information. He was aware that Gretchen was involved

with someone else, and he felt as though Gretchen wanted him to stay away and that she was starting a life of her own. After Gretchen died, Nila borrowed money to retain an attorney so that he could get custody of G.L.G. He also attended parenting classes.

The defendant called the plaintiff as an adverse witness. She testified that she notified Nila of G.L.G.'s birth on the day she was born. She testified that Gretchen sent Christmas cards, letters, and photographs to the defendant during the first year after G.L.G. was born. The day that Gretchen died, the plaintiff spoke with an attorney, who advised her that it was important to establish a residence for G.L.G. so that she would not be placed in foster care. She testified that, at that time, she knew only the first name of the defendant and that he lived in Keithsburg. She did not know his last name or how to reach him.

Nila C. also testified on behalf of the defendant. Nila testified that she was the defendant's sister-in-law. In December or January 1995, there was a meeting in her home where several individuals were present, including Chief McGuire, Gretchen, and the defendant. She testified that there was no discussion at that time regarding the defendant's rights to the unborn child but, rather, the parties were more concerned with the possibility that Gretchen would have to go to jail while pregnant.

After the meeting with Chief McGuire, the defendant and Gretchen saw each other one additional time before G.L.G.'s birth. On May 22, 1995, they attended a graduation in Keithsburg. Nila was also present. She witnessed a conversation between Gretchen and the defendant and testified that there was no discussion at that time about the upcoming birth of G.L.G.

Nila testified that she had received phone calls and letters from Gretchen while Gretchen resided in Woodstock. The defendant had asked Nila quite a few times for Gretchen's address, but she refused because Gretchen and Button told her not to give it to him. The first time that Gretchen had requested that Nila not divulge her whereabouts to the defendant was in January 1996, when Gretchen again moved. Nila abided by Gretchen's request because she was afraid that if she did not Gretchen would cut off contact between her and G.L.G.

Nila testified that, prior to January 1996, the defendant had Gretchen's address. During that time, Gretchen still had contact with the defendant. She sent him pictures and wrote him letters. Nila testified that she asked Gretchen about G.L.G. many times and passed the information to the defendant. The defendant asked Nila about G.L.G. "all the time."

During the defendant's visitation with G.L.G. during Labor Day

weekend in 1995, Gretchen stayed at Nila's home. During that visitation, Nila observed the defendant with G.L.G. Nila testified that she saw him feeding, playing with, holding, and rocking her. The defendant gave G.L.G. toys and clothes. Gretchen did not have any further conversations with the defendant after that weekend.

Nila testified that, in approximately January 1996, the defendant showed Nila a copy of the notice of the paternity suit. The defendant then asked her to drive him to court. She was unable to transport him at that time; however, she telephoned the courthouse and spoke with a court official or a judge. She advised this individual that she was unable to bring the defendant to court at that time and asked whether it could be rescheduled. She further stated that the defendant did not deny that he was the father and that the defendant would "try to pay what he could." She had no further conversations with the defendant regarding his rights and responsibilities towards G.L.G. until after Gretchen died.

After learning of Gretchen's death, Nila contacted the defendant and began making preparations to go to Woodstock for Gretchen's funeral and to make arrangements for G.L.G. When she and the defendant arrived in Woodstock, they went to the State's Attorney's office. She advised an assistant State's Attorney that the plaintiff told her that the plaintiff was going to get guardianship of G.L.G. and that she "was going to have the baby whether [they] liked it or not." After returning to Keithsburg, they hired an attorney so that the defendant could obtain custody.

The defendant had been receiving his father's death benefits from social security, but the defendant's mother took at least half of the funds each month. In September 1996, the defendant moved in with Nila and the defendant's brother, Donny C., so that he could go back to school full time. He was not able to work part time because they lived in a small community and he had no transportation. At the time the defendant was living with Nila, he did not pay rent or buy groceries. He did not own a car.

At the close of testimony, the plaintiff argued that the defendant had not demonstrated any interest in G.L.G. She argued that the minority of the defendant was irrelevant and that he was not prevented from visiting or communicating with G.L.G. after her birth. She pointed out that any impediment resulted from Nila's actions. The plaintiff argued that the failure of the defendant's own family member to provide him with Gretchen's address was not a sufficient impediment under the Adoption Act to excuse his conduct. The plaintiff further argued that the defendant did nothing to establish his rights or responsibilities as a parent within 30 days of G.L.G.'s birth.

Specifically, the plaintiff argued that he failed to sign a birth certificate and that his sole visitation with G.L.G. was more than 30 days following her birth. In sum, the plaintiff argued that the defendant could be found unfit on any one of the following statutory factors contained in the Adoption Act: abandonment, intent to forego parental rights, or failure to maintain a reasonable degree of interest and concern for G.L.G. See 750 ILCS 50/1 (West 1994).

The defendant argued that his transportation and financial difficulties, coupled with the warning from Chief McGuire, made it difficult for him to exercise his parental rights and responsibilities. The defendant further argued that, once his resources permitted it, he took remedial steps to exercise parental rights and responsibilities. The defendant pointed to the fact that he had participated in the court proceedings, taken a parenting class, and established a relationship with G.L.G. The defendant urged the trial court to focus on the steps he later took following the death of Gretchen.

The guardian *ad litem* tendered oral recommendations to the trial court. The guardian stated that it appeared that the plaintiff had proved that the defendant was unfit. She indicated that she was troubled by the defendant's failure to obtain contact information during his visit with G.L.G. over Labor Day weekend in 1995. The guardian also pointed out that there was no contact with G.L.G. within 30 days of birth, as well as a period of $13^{1}/_{2}$ months with no contact. However, the guardian also expressed concern that Gretchen's actions in moving frustrated the defendant's ability to locate G.L.G. and that a 17-year-old boy would not have the resources to locate her if he desired to do so.

At a hearing on June 26, 1998, the trial court found that the burden of proof was on the plaintiff to present clear and convincing evidence that the defendant was unfit. The trial court ruled that the plaintiff had failed to carry her burden of proof and denied the petition for adoption. The trial court found that, at the time of G.L.G.'s birth, the defendant was a 17-year-old high school student who did not have a driver's license or any means of transportation and that he had little or no money. The trial court further found that Gretchen had become involved with someone else and had moved around a great deal. Moreover, the trial court noted that the defendant had been told by Chief McGuire not to have anything to do with Gretchen.

At the conclusion of the hearing, the plaintiff indicated her desire to proceed to a hearing on custody of G.L.G. pursuant to section 20 of the Adoption Act (750 ILCS 50/20 (West 1994)). The trial court deferred setting the hearing to allow time for dispositive motions to be filed regarding the issue of whether the plaintiff was entitled to a

custody hearing pursuant to section 20 of the Adoption Act. The trial court subsequently entered an order finding the defendant not unfit.

On July 10, 1998, the defendant filed his motion to dismiss the petition for adoption, pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1994)). In his motion, the defendant alleged that he had not been found unfit by the trial court and that he would not consent to G.L.G.'s adoption. On August 21, 1998, the trial court entered an order denying the defendant's motion to dismiss. On October 28, 1998, the defendant filed a petition to reconsider the trial court's ruling of August 21, 1998.

Following a hearing on November 20, 1998, the trial court denied the petition to reconsider because the motion to dismiss attacked the sufficiency of the pleadings. The trial court found that such a motion was inappropriate after the adoption petition had already been denied. The trial court also ruled that the plaintiff lacked standing to proceed to a custody hearing under section 20 of the Adoption Act. In addition, the trial court found that the defendant's motion to dismiss filed on November 14, 1996, was a proper motion, which should have been granted. The trial court's subsequent written order of January 11, 1999, granted the defendant's motion to dismiss filed on November 14, 1996. The plaintiff filed a timely notice of appeal seeking review of the trial court orders of June 26, 1999, and January 11, 1999.

■ On appeal, the plaintiff argues that (1) the trial court erred in ruling that she had no standing to proceed to a custody hearing under section 20 of the Adoption Act; and (2) the trial court's finding that the defendant was not unfit was against the manifest weight of the evidence. As a threshold matter, we note that the defendant has failed to file a brief in this appeal. While we in no way condone this practice, reversal is not automatic since the burden remains on the appellant to show error. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131-32 (1976). This does not mean that we are required to search the record for the purpose of sustaining the judgment of the trial court, but we may, in the interests of justice, do so. *First Capitol Mortgage Corp.*, 63 Ill. 2d at 133. Because we find that the appellant's brief sufficiently presents the issues for review, we will decide the merits of this appeal from the facts and legal arguments before us without the aid of an appellee's brief.

On appeal, the plaintiff argues that the following factors support a finding that the defendant was unfit: (1) the defendant failed to maintain a reasonable degree of interest, concern, or responsibility for G.L.G.'s welfare; (2) the defendant had abandoned G.L.G.; (3) the defendant evidenced an intent to forgo his parental rights; and (4) the defendant deserted G.L.G. for three months next preceding the filing

of the adoption proceeding. See 750 ILCS 50/1(D) (West 1994). We agree with the plaintiff's argument that the finding that the defendant was not unfit was against the manifest weight of the evidence.

■ When a petition for adoption alleges that a parent is unfit, the first issue, prior to granting the adoption, is a determination of whether the parent is unfit. *Regan v. Joseph P.*, 286 Ill. App. 3d 889, 892 (1997). If the parent is found unfit, the second issue is whether the adoption is in the child's best interest. *Regan*, 286 Ill. App. 3d at 892.

■ Parental unfitness must be proved by clear and convincing evidence, and the trial court's finding will not be reversed unless it is against the manifest weight of the evidence. *In re C.L.T.*, 302 Ill. App. 3d 770, 772 (1999). Each case concerning parental unfitness is *sui generis*, unique unto itself. *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). As such, courts generally do not make factual comparisons to other cases. *In re A.S.B.*, 293 Ill. App. 3d 836, 843 (1997).

■ Under the Adoption Act, "unfit person" is defined to be "any person whom the court shall find to be unfit to have a child." 750 ILCS 50/1(D) (West 1994). Section 1 of the Adoption Act then enumerates several grounds for unfitness, including abandonment (750 ILCS 50/1(D)(a) (West 1994)); failure to show reasonable interest, concern, or responsibility as to the child's welfare during the first 30 days of the child's life (750 ILCS 50/1(D)(l) (West 1994)); evidence of intent to forego parental rights (750 ILCS 50/1(D)(n) (West 1994)) and desertion of the child for more than three months next preceding the commencement of the adoption proceeding (750 ILCS 50/1(D)(c) (West 1994)). A finding of parental unfitness may be based on evidence sufficient to support any *one* statutory ground, even if the evidence is not sufficient to support the other grounds alleged. *C.L.T.*, 302 Ill. App. 3d at 772.

■ We first address whether the defendant demonstrated, within 30 days of G.L.G.'s birth, concern, interest, or responsibility for G.L.G.'s welfare that, under the circumstances, was of a reasonable degree. See *In re A.M.*, 294 Ill. App. 3d 616, 625 (1998). Where the allegations of unfitness concern a failure to demonstrate a reasonable degree of interest, concern, or responsibility to a newborn child, fitness is determined by the efforts the person makes to communicate with or show interest in the child. *A.S.B.*, 293 Ill. App. at 843. Section 1(D)(l) of the Adoption Act imposes a substantial burden on natural parents to demonstrate a reasonable degree of interest, concern, or responsibility for a child during the first 30 days after its birth. *A.S.B.*, 293 Ill. App. 3d at 844. The burden is " 'unequivocal and requires that a parent affirmatively show a commitment to his child within 30 days

of birth.' " *A.S.B.*, 293 Ill. App. 3d at 844, quoting *In re Adoption of J.R.G.*, 247 Ill. App. 3d 104, 110 (1993). Even extreme circumstances that impede the parent's ability to develop a relationship with the child do not excuse a complete lack of communication or interest in the child. *A.S.B.*, 293 Ill. App. 3d at 843-44.

■ The record in this case reflects that the defendant was aware of Gretchen's pregnancy as early as January 1995, or at least seven months prior to G.L.G.'s birth. The defendant did not pay any pregnancy expenses. He made no effort to prepare for the birth of G.L.G. or G.L.G.'s future.

When G.L.G. was born, the defendant did nothing to establish his parental rights and responsibilities. He did not visit G.L.G. in the hospital or telephone Gretchen to learn of G.L.G.'s welfare. He did not pay child support or delivery expenses or make any offer to do so despite his income from employment and social security. He did not send cards or flowers to G.L.G. or Gretchen. He made no attempt to sign a birth certificate or to institute a paternity proceeding. The record is clear that the first contact the defendant had with G.L.G. was over Labor Day weekend in 1995, which was more than 30 days after G.L.G.'s birth. Moreover, that contact was not initiated by the defendant but, rather, by Gretchen. In short, the defendant did nothing within the first 30 days of G.L.G.'s life to demonstrate any interest, concern, or responsibility for G.L.G. or her welfare.

We are unpersuaded by the defendant's arguments at the trial level that he was hindered from demonstrating interest, concern, or responsibility for G.L.G. It is undisputed that the defendant had contact with Gretchen both during the pregnancy and after G.L.G.'s birth. Whether he knew the precise address of G.L.G. and Gretchen is disputed. Viewing the testimony in the light most favorable to the defendant, however, it cannot be denied that he had ample opportunity to attempt to learn G.L.G.'s address, which he allowed to slip away. It is illogical to complain on the one hand that he was unaware of G.L.G.'s whereabouts when, at the same time, he sat idly by.

The trial court heard arguments that, from the defendant's perspective, Gretchen had moved on with her life, and the trial court based its finding in part on the fact that Gretchen had become involved with someone else. We are unmoved by the assertion that Gretchen somehow impeded the defendant's ability to assert interest, concern, or responsibility for G.L.G. To the contrary, the evidence before us suggests that Gretchen attempted to create contacts between the defendant and G.L.G. by sending cards, letters, and photographs, and by bringing G.L.G. from Woodstock to see the defendant in Keithsburg. The defendant's burden to establish his parental rights and responsibilities is not dependent upon Gretchen's lifestyle choices.

Moreover, any actions or inactions on Gretchen's part or the part of Chief McGuire during the pregnancy are irrelevant in assessing whether the defendant demonstrated his interest, concern, or responsibility for G.L.G. within 30 days of her birth. If the record before us suggested that the defendant made attempts to establish his parental rights and responsibilities, but that such attempts were thwarted by Gretchen or by Chief McGuire, then this case might have a different result. In the absence, however, of a scintilla of evidence that the defendant attempted to display interest, concern, or responsibility for G.L.G. within 30 days of her birth, we cannot say that any action or inaction by Gretchen or Chief McGuire is in any way relevant to our analysis.

In the absence of any effort by the defendant within the first 30 days of G.L.G.'s birth, we cannot conclude that he has evinced a reasonable degree of interest in G.L.G. See *A.S.B.*, 293 Ill. App. 3d at 844. Accordingly, the trial court's order finding the defendant not unfit was against the manifest weight of the evidence.

Because a finding of parental unfitness may be based on evidence to support any one statutory ground, we need not address the plaintiff's other arguments. See *A.M.*, 294 Ill. App. 3d at 625. Because we hold that the trial court's order of June 26, 1998, was against the manifest weight of the evidence, we need not reach the plaintiff's argument that the trial court erred in ruling that she had no standing to proceed to a custody hearing under section 20 of the Adoption Act. We note that in the proceedings below the parties have intermingled the issues of standing to bring an adoption petition and standing to proceed to a custody hearing under section 20 of the Adoption Act after the denial of an adoption petition. To avoid confusion on remand, we note that, if G.L.G. is indeed a "related child" within the meaning of section 1(B) of the Adoption Act (750 ILCS 50/1(B) (West 1994)), then the plaintiff has standing to file and to proceed on the adoption petition. We therefore vacate the trial court's subsequent order of January 11, 1999.

For the foregoing reasons, we hold as follows:

(1) the June 26, 1998, order of the circuit court of McHenry County finding the defendant not unfit and denying the adoption petition is reversed;

(2) the trial court's January 11, 1999, order is vacated;

(3) the plaintiff's petition to adopt is reinstated, and the cause is remanded for a hearing on the petition in order to consider G.L.G.'s best interests (See *Syck*, 138 Ill. 2d at 277); and

(4) on remand, we order that this cause be assigned to a different judge for further proceedings consistent with this decision.

Reversed in part and vacated in part; cause remanded with directions.

INGLIS and McLAREN, JJ., concur.