The respondent, C.S., appeals from an order of the trial court finding her to be an unfit parent, terminating her parental rights, and granting the State the power to consent to the adoption of the respondent's minor children, M.M. and J.M. We affirm.
On April 29, 1996, the State filed a petition for adjudication of neglect and abuse. On May 9, 1996, the State filed an amended petition alleging that both of C.S.'s children, M.M. and J.M., born February 22, 1992, and May 12, 1996, respectively, were abused in that C.S. and her then-boyfriend Steve S. inflicted or allowed to be inflicted upon the children physical injury. More specifically, the petition alleged that J.M. had burns on her back and both children had cuts and bruises on their bodies. The State named C.S., the children's mother, and Arthur H., the named father of the children, as respondents to the petition. On October 31, 1996, C.S. and Arthur stipulated to these allegations, and the trial court found J.M. and M.M. to be abused minors, made them wards of the court, and placed them under the custody and guardianship of the Department of Children and Family Services (DCFS). C.S. and Steve later married.
On March 22, 1998, the State filed a petition seeking the *Page 561 
termination of the parental rights of both C.S. and Arthur. The petition alleged that C.S. was an unfit parent for the following reasons: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to her children's welfare under section 1(D)(b) of the Adoption Act (the Act) (750 ILCS 50/1(D)(b) (West 1996)); (2) an inability to discharge her parental responsibilities, due to mental impairment, mental illness, or mental retardation, with sufficient justification to believe her inability to discharge those duties would extend beyond a reasonable time period under section 1(D)(p) of the Act (750 ILCS 50/1
(D)(p) (West 1996)); and (3) failure to make reasonable efforts to correct the conditions that were the basis for the children's removal from their home or to make reasonable progress toward the children's return within 12 months of the adjudicatory order under section 1(D)(m) of the Act (750 ILCS 50/1(D)(m) (West 1996)).
At the hearing on the petition, Jim Rimkus, an investigator with the Division of Child Protective Services, testified that, pursuant to certain allegations made on April 22, 1996, he conducted several investigations with respect to J.M. and M.M. Rimkus stated that both children were filthy, had an offending odor, were infested with head lice, had numerous cuts, bruises and welts inflicted upon them by C.S. and Steve, and had inadequate shelter. During another investigation Rimkus confirmed that J.M. had severe burns on her back caused by C.S. and Steve and that both children were again suffering from numerous other bruises. When Rimkus visited the home on May 8, 1996, the children were filthy, smelly, infested with head lice, and suffered from numerous injuries on various parts of their bodies. C.S. told Rimkus that J.M. had been scalded by bath water and that M.M.'s bruises occurred when M.M. "fell off the wall." Rimkus took the children into protective custody at that time.
Laura Harris, a DCFS caseworker, testified that a May 1996 client service plan addressed C.S.'s need to work on parenting skills, obtain a psychological examination, engage in supervised visits with her children, and procure adequate counseling. Harris stated that by January 1997 C.S. and Steve had participated in the services offered to them, C.S. had completed a psychological evaluation, and the couple moved into a one-bedroom apartment. The apartment was in very bad condition and littered with debris. Despite these problems, Harris evaluated C.S.'s progress as satisfactory.
Between January and April 1997, Harris visited C.S.'s home on numerous occasions and concluded that the home was dangerous to small children. The home was filled with debris and numerous bugs and had a foul smell. Further, a mouse was running through the apartment. C.S. explained to Harris that the mouse ate the roaches. *Page 562 
According to Harris, C.S. did not see any problem with her housekeeping and was unresponsive to Harris's suggestions; despite Harris's encouragement and advice, the situation became worse. However, in July 1997, Harris rated C.S.'s progress as satisfactory.
Harris testified that during supervised visits C.S. was very passive and did not interact with her children. Rather, Steve took the entire responsibility for disciplining and interacting with them. Harris stated that she had trouble engaging C.S. in conversations. When Harris asked her questions, C.S. "would just sit there and stare." M.M. told Harris that he was afraid when he visited his mother because there were bugs in his hair. In October 1997, C.S. and Steve began unsupervised visits with the children. Shortly after these began, Harris observed bruises on J.M.'s arms and large bumps on M.M.'s head. Neither C.S. nor Steve could explain how these injuries occurred. In addition to the injuries, the children exhibited bad behavior at their foster home and fear and anxiety over the visits. J.M. refused to visit her mother; J.M. cried and hid in her room before the scheduled visits. M.M. began to wet his bed, and a therapist indicated that he was having severe stress reactions after visits. At this point, the unsupervised visits ended.
In January 1998, Harris evaluated C.S.'s progress as unsatisfactory. Harris stated that the home was not safe, the visits were deteriorating, C.S.'s cooperation with the DCFS was poor, and C.S.'s progress in therapy was unsatisfactory. According to Harris, between January 1998 and March 1998, the conditions in C.S.'s home became worse. The home was littered with so much debris that one could not walk without hurting oneself, and the smell was intolerable, most likely due to the numerous pets kept in unclean cages in the apartment.
Harris opined that when she first met C.S. and Steve their parenting skills were at the lowest level she had ever seen. They made some progress in the first year, but, after the unsupervised visits began, things deteriorated a great deal. After the petition for termination was filed in March 1998, C.S.'s and Steve's progress improved again, and Steve saw a psychiatrist about obtaining medication.
Dawn McGrath, a parent training coordinator, taught C.S. and Steve from September 1996 to December 1996. C.S.'s score on the "nurturing quiz" was below average and did not change. McGrath explained that the "nurturing quiz" measured cognitive skills and a parent's potential to be nurturing and abusive. C.S.'s problem-solving skills were very limited, and she seemed very unmotivated. C.S. did not participate in class and did not remove dangerous objects from her home without prompting. C.S. did not understand what could harm *Page 563 
her children. For example, she left a box of glasses, glass bowls, and razor blades on the kitchen floor within easy reach of young children. McGrath had to explain to C.S. that these items were dangerous and needed to be put away.
Laura Windsor, a licensed clinical social worker, testified that she conducted couples' counseling with C.S. and Steve from May 1997 to August 1997. Windsor stated that Steve dominated the sessions and C.S. had a difficult time separating herself from Steve. C.S. met with Windsor individually but stopped after Steve objected. Steve appeared to be irrational at times and stated that M.M. was evil. Windsor believed Steve might harm the children. C.S. needed to acknowledge the past abuse by her and Steve and how this abuse affected her children. However, C.S. made no progress in that area, and Windsor feared that C.S. would take no action to protect her children from Steve. The counseling ended at Steve's request.
Rose Parsons, a DCFS aide/homemaker, testified that she visited C.S.'s home between December 1997 and January 1998. C.S. did not understand that her home was filthy or that she needed to address the problem. Uncovered razor blades were left within easy reach of the children, trash was kept in the home, and there were dead and live bugs in the kitchen. Further, Steve told Parsons that there had been a fire in the home caused by papers left on the heater. Parsons pointed out to Steve that papers were again on the heater and needed to be removed.
Kathleen Foley, a licensed clinical social worker, testified she visited C.S.'s home 17 times from September 1997 until May 1998. Foley was assigned to C.S.'s case to teach C.S. parenting skills. According to Foley, C.S. and Steve lacked an understanding as to what they needed to change or what problems existed. During visits, C.S. spoke, played, and interacted little with her children and did not seem to know how to interact with them or protect them. When Foley suggested that C.S. role play, she refused, explaining that her mother was going to get her children and then give them back to her. Foley stated that C.S. failed to make any progress from September 1997 to May 1998. Foley also opined that C.S. lacked both the knowledge and willingness to parent effectively and that her prognosis for gaining that ability was "very, very poor" and not likely to change within a year.
O'Riordan, a licensed clinical psychologist, testified that he examined C.S. in July 1996 and April 1998. During the July 1996 examination, C.S. showed either a flat affect or smiled inappropriately when she spoke about how her children were hurt or the pain they had suffered. O'Riordan administered intelligence and personality *Page 564 
tests to C.S. in July 1996 and again in April 1998. Based on the results of intelligence tests, O'Riordan stated that C.S. was in the mild range of mental retardation, although one would have to look at her daily living skills to make a final determination. Based on personality tests and interviews O'Riordan also concluded that C.S. had borderline intelligence, limited intellectual capabilities, limited personality factors such as a lack of empathy for her children, denial regarding problems with the care of her children, and trouble with abstract concepts such as what to do when someone is sick. O'Riordan stated that, because of C.S.'s limited intelligence, she was not a good candidate for counseling. Further, her personality problems would make counseling very difficult. O'Riordan stated that someone with borderline intelligence could be a functioning parent but not without the willingness to follow instructions and a support system. C.S. lacked both of these requirements.
O'Riordan found no progress in C.S.'s condition from July 1996 to April 1998; C.S. did not progress in her capability to understand how the physical abuse she and Steve committed against her children affected them, C.S. did not empathize with her children's suffering, and C.S. had long-standing personality traits of general passivity, denial, and a tendency to avoid problems. Based on test results, O'Riordan opined that Steve suffered from paranoid schizophrenia, acted irrationally, and was dangerous. Further, because of C.S.'s general passivity, denial, and tendency to avoid problems, she would not be able to protect her children from Steve. Given C.S.'s intellectual limitations and personality disorders, O'Riordan opined that C.S. would never have the capability to be an effective parent.
At the close of the State's case, the trial court granted directed findings in favor of C.S. on the allegations that C.S. failed to maintain a reasonable degree of interest, concern, or responsibility as to her children's welfare under section 1(D)(b) of the Act and failed to make reasonable efforts to correct the conditions which were the basis for the children's removal from their home under section 1(D)(m) of the Act. The court denied C.S.'s motion for directed findings on the remaining allegations, that C.S. had an inability to discharge her parental responsibilities due to mental impairment, mental illness, or mental retardation, with sufficient justification to believe her inability to discharge those duties would extend beyond a reasonable time period under section 1(D)(p) of the Act, and that C.S. failed to make reasonable progress toward the children's return within 12 months of the adjudicatory order under section 1(D)(m) of the Act.
Barbara Adrian, a minister with the Aurora Faith Center, testified on C.S.'s behalf. She stated that she provided counseling to C.S. and *Page 565 
Steve from September 1997 to December 1998. During that time, Barbara observed a vast improvement in the couple's everyday living skills. The couple kept their apartment clean, had painted some of the rooms, and were learning budgeting skills. Adrian stated that C.S. was willing to learn and was a quick learner. Once C.S. was shown a task, she was able to do it on her own.
At the close of testimony, the trial court found that the State established the remaining allegations of unfitness by clear and convincing evidence against C.S. The trial court also found that the State established all allegations of unfitness against Arthur H. On June 12, 1998, following a hearing, the court found it to be in the children's best interests to terminate both C.S.'s and Arthur H.'s parental rights and so ordered. C.S. filed this timely appeal. Arthur has not appealed that order.
On appeal, C.S. argues that the State failed to establish by clear and convincing evidence that C.S. suffered from a mental impairment, mental illness, or mental retardation so as to warrant a finding of unfitness under section 1(D)(p) of the Act. Further, she argues that the State failed to prove that her failure to discharge her parental responsibilities was a result of her mental impairment. The State argues that the trial court's finding of unfitness is not against the manifest weight of the evidence. We agree with the State.
In order to uphold a trial court's termination of parental rights, the State must have proved, by clear and convincing evidence, that the parent is unfit. In re A.M., 294 Ill. App.3d 616, 624 (1998). The trial court's findings will not be disturbed on appeal unless they are against the manifest weight of the evidence. In re J.A.S., 255 Ill. App.3d 822, 823 (1994). For a finding to be against the manifest weight of the evidence, the opposite result must be clearly evident from a review of the evidence. In re I.D., 205 Ill. App.3d 543, 550 (1990).
Section 1(D)(p) of the Act defines unfitness as follows:
 "(p) [I]nability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness or mental retardation as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1-106 of that Code, and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West 1996).
Section 1-116 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-116 (West 1996)) defines mental retardation as follows: *Page 566 
 "`Mental retardation' means significantly subaverage general intellectual functioning which exists concurrently with impairment in adaptive behavior and which originates before the age of 18 years."
It is well settled that, in order to find a parent unfit under section 1(D)(p) of the Act, the State must (1) present competent evidence that the parent suffers from a mental impairment, mental illness, or mental retardation sufficient to prevent her from discharging a parent's normal responsibilities; and (2) there must be sufficient evidence to conclude that the inability will extend beyond a reasonable time period. 750 ILCS 50/1
(D)(p) (West 1996); J.A.S., 255 Ill. App.3d at 824. We are satisfied that the State has established both aspects of the test by clear and convincing evidence.
The trial court's finding of unfitness was supported by clear and convincing evidence. Dr. O'Riordan, a clinical psychologist, testified that, in his opinion, C.S. was mildly retarded. He also stated that C.S. had limited intellectual capabilities and personality disorders, was unable to deal with abstract thinking, denied problems regarding her children, tended to avoid problems, and was incapable of protecting her children from Steve. In almost two years, O'Riordan saw no progress in C.S.'s condition. Thus O'Riordan's testimony alone provided sufficient justification to support the trial court's finding of unfitness.
Further, numerous other witnesses provided testimony regarding C.S.'s limited mental capabilities. Harris and Parsons testified that C.S. did not understand that her home was filthy and unsafe for children. McGrath testified that C.S. did not understand what could harm her children. Foley, a licensed clinical social worker, testified that C.S. did not understand her problems and what she needed to change. Further, the record reveals that, even after counseling and therapy, C.S. was unable to protect her children from injury during unsupervised visits. In light of the totality of the evidence, the trial court's finding that C.S. suffered from a mental impairment or mental retardation that prevented her from discharging a parent's normal responsibilities was not against the manifest weight of the evidence. Certainly, the opposite conclusion was not clearly evident.
C.S. argues that O'Riordan's testimony failed to establish by clear and convincing evidence that C.S. suffered from mental retardation. C.S. supports this assertion with O'Riordan's statement that, although the test scores indicated that C.S. was mildly retarded, "[y]ou would have to look at her daily living skills to make the final determination." However, after looking at the record, it is clear that O'Riordan was simply explaining the meaning of the test score. He did not state that he lacked the necessary information to make a diagnosis. In fact, the *Page 567 
record indicates that O'Riordan considered C.S.'s daily living skills and responded affirmatively when asked whether he diagnosed C.S. as being mentally retarded.
C.S. also argues that no psychiatrist or clinical psychologist testified that C.S.'s condition originated before the age of 18. However, in light of O'Riordan's testimony regarding C.S.'s low intelligence and personality problems, a reasonable fact finder could have inferred that C.S.'s mental retardation existed from the time she was 18 years old. Regardless, the State was not required to prove that C.S. was mentally retarded. A finding of unfitness can be based on a respondent's mentalimpairment sufficient to prevent her from discharging a parent's normal responsibilities. 750 ILCS 50/1(D)(p) (West 1996). O'Riordan, a clinical psychologist, offered ample evidence to support this finding.
C.S.'s citation to In re M.W., 199 Ill. App.3d 1050 (1990), is distinguishable. In M.W., there was no evidence that either respondent suffered from the severe personality disorders experienced by C.S. in the case at bar. Thus, M.W. is not controlling.
Regarding the second part of the test, the State must present only "sufficient justification" to support the trial court's findings that the impairment will extend beyond a reasonable period of time. 750 ILCS 50/1(D)(p) (West 1996). "A medical prognosis need not be absolutely conclusive to satisfy the requirement of the statute." J.A.S., 255 Ill. App.3d at 824.
The State presented ample evidence that C.S.'s mental impairment will extend beyond a reasonable period of time. O'Riordan testified that, given C.S.'s intellectual limitations and personality disorders, she would never have the capability to be an effective parent. Foley stated that C.S. lacked both the knowledge and willingness to parent effectively and her prognosis for gaining that ability was "very, very poor" and not likely to change within a year. She also stated that C.S. made no progress from September 1997 to May 1998. Harris testified that C.S.'s housekeeping became increasingly worse from July 1996 to March 1998. Thus, the State proved by clear and convincing evidence that C.S.'s mental impairment would extend beyond a reasonable period of time. Accordingly, the trial court's finding of unfitness is not against the manifest weight of the evidence.
Because a finding of parental unfitness may be based on evidence sufficient to support any one statutory ground, we need not address the issue of whether the State met its burden of proving that C.S. failed to make reasonable progress toward the children's return within 12 months of the adjudicatory order under section 1(D)(m) of the Act. See In re J.A.S., 255 Ill. App.3d at 825. *Page 568 
The judgment of the circuit court of Kane County is affirmed.
Affirmed.
GEIGER and COLWELL, JJ., concurring.