*In re* CORNICA J. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Tonya L. *et al.*, Respondents-Appellants).

Second District    No. 2—04—0105

Opinion filed August 9, 2004.

Elliot A. Pinsel, of Daniels, Long & Pinsel, of Waukegan, for appellants.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of

558

State's Attorneys Appellate Prosecutor's Office, of counsel), and Paul Benjamin Linton, of Northbrook, for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Following an evidentiary hearing, the circuit court of Lake County found that respondents, Tonya L. and Clayton J., were unfit parents under section 1(D)(p) of the Adoption Act (Act) (750 ILCS 50/1(D)(p) (West 2002)). The court subsequently terminated respondents' parental rights to Cornica J. and Cortrell J. On appeal, respondents argue that the circuit court erred by finding them unfit and by terminating their parental rights. We reverse.

## I. BACKGROUND

Cornica, born January 31, 1999, and Cortrell, born March 22, 2000, were adjudicated neglected and made wards of the court on June 26, 2000. On September 19, 2002, the State filed a petition to terminate respondents' parental rights to both minors (and four children who are not subjects of this appeal). The petition alleged that respondents were unable to discharge parental responsibilities, due to mental impairment, mental illness, mental retardation, or developmental disability, and that there was sufficient justification to believe that such inability would extend beyond a reasonable time period. 750 ILCS 50/1(D)(p) (West 2002).

At the fitness hearing, the State's only witness was Dr. Valerie Bouchard, who testified as follows. Dr. Bouchard, a clinical psychologist licensed in Illinois in 1996, completed a "parenting capacity assessment" for each respondent on January 7, 2002. The assessment is designed to provide information regarding the nature of the parent-child relationship. The parenting capacity assessment consisted of a one-hour parent-child observation session and an individual interview with each parent. Each interview included a mental status exam, a clinical interview, and the administration of two parenting measures.

The parent-child observation session took place in a room at the Department of Children and Family Services (DCFS) containing a small table, several chairs, and various play items. The session included both respondents, Cornica, Cortrell, and respondent mother's four older children. Dr. Bouchard remained in the room throughout the session, and respondents were informed that they would be observed.

At the beginning of the session, Dr. Bouchard noticed that the children greeted, approached, and hugged respondent mother, but not respondent father. Respondents were sitting in chairs when the children arrived and waited for the children to initiate contact with them. Throughout this portion of the assessment, respondents were

extremely passive, getting out of their chairs only once. For the most part, respondent mother watched the children play, getting up once to initiate contact with them. Respondent father was observed coloring in a book by himself and getting up once to retrieve a child from the bathroom. At one point, respondent father called Cornica and Cortrell over to him to hug them, hold them, and kiss them.

According to Dr. Bouchard, respondents exhibited a high level of passivity and difficulty in managing the children. The children's level of activity was high and their behavior was "pretty chaotic." At times, the children threw objects around the room, and there was no intervention until someone got hit in the head. When that happened, respondent mother dealt with the situation by raising her voice and telling the child not to throw the object. This sequence occurred approximately three times. The children continued to throw objects without any intervention until respondent mother raised her voice higher, and then the behavior stopped. Respondent mother's oldest child provided the most structure during the session by organizing some activities for the children. Respondent mother did join in those activities for a short time.

At the end of the session, Dr. Bouchard conducted a separate interview with each respondent. She administered a mental status exam to determine if respondents were oriented to reality, aware of what was going on, and capable of participating in the interview process. This was followed by a clinical interview to obtain information about their backgrounds, the reasons for DCFS involvement, and their general impressions of the situation. In addition, a Parent Awareness Skills Survey was used to measure respondents' abilities to intervene in typical parent-child problems. Finally, the Bricklin Parenting Questionnaire provided information about respondents' knowledge of their children's interests, desires, concerns, and uniqueness.

In terms of the mental status examination, respondent father was fully oriented to reality and able to understand the procedures and participate in the interview process. He was able to identify two primary means of intervening with the children, time-outs and withholding privileges, as appropriate disciplinary measures. In the clinical interview, respondent father articulated a basic understanding of the reasons the children had been removed from their care. He expressed the belief that he was being treated unfairly and that each time he made a step toward meeting some of the requirements, another requirement would be added. In his view, this was a deliberate attempt on the part of DCFS personnel to prevent reunification with his children.

Respondent father exhibited a weakness in his capacity to intervene in the emotional issues of a child. He exhibited a lack of knowledge about average child development and the emotional needs of a child, such as how to intervene with a child who is excessively shy or needs special education. In addition, the Bricklin Parenting Questionnaire revealed that respondent father lacked knowledge of the particular interests and concerns of each child. He did not know the children's interests or hobbies.

With respect to respondent mother, the mental status examination indicated that she was oriented to reality, aware of the circumstances of the assessment, and capable of participating in the interview process. She demonstrated familiarity with the techniques of time-outs and loss of privileges for misbehavior. However, respondent mother possessed very little awareness of a child's emotional needs or age-appropriate developmental needs. When a dangerous scenario was presented to her, she did not understand that it was dangerous or could result in injury. Respondent mother also exhibited the potential to provide "questionable moral guidance" when confronted with certain behavior, such as lying. Finally, the Bricklin Parenting Questionnaire indicated that respondent mother lacked knowledge of the interests, concerns, and issues of each child.

After completing the individual interviews with respondents, Dr. Bouchard observed the end of the visit. Neither the children nor their parents initiated saying "good-bye" until reminded to do so.

A few days later, Dr. Bouchard observed respondents in their home to determine if the environment was suitable for the children. Respondents live in a high-rise apartment with three bedrooms. The apartment was "essentially clean," with a working microwave and refrigerator, although there were no protective devices on the outlets or the cabinets. There was not enough sleeping space for six children, and the apartment contained very little furniture and few toys.

Dr. Bouchard again evaluated respondents in September 2002. Respondent father arrived on time for his appointment on September 27, 2002, and Dr. Bouchard administered a battery of tests. Overall, respondent father was "functioning below average." The Wechsler Adult Intelligence Scale (cognitive functioning) revealed an IQ score of 69, which falls in the extremely low range of intellectual functioning. There was a significant discrepancy between his verbal score and his overall IQ score, indicative of emotional interference. The Wide Range Achievement Test (grade equivalent functioning) showed that his word pronunciation, word recognition, and spelling abilities were at a third-grade level, and his arithmetic ability was at a fifth-grade level. Due to his limited verbal skills, respondent father could not provide

enough responses to validate the results on the Rorschach Ink Blot Test. According to the Bender Visual-Motor Gestalt Test (neurological screening mechanism), respondent father had no neurological problems. Further, he satisfactorily completed the Symptoms Checklist, which is a list of immediate symptoms or problems a person may be experiencing, as well as the Rotter Incomplete Sentences Test. Finally, respondent father scored 45 out of 100 on the global assessment of functioning scale, indicating an impairment in daily functioning that affected interpersonal relationships and the ability to maintain a job.

Dr. Bouchard evaluated the test results. She found strong evidence of poor impulse control, meaning that respondent father reacted very quickly without thinking through his responses. In addition, his emotions changed more rapidly than would be expected for the average person. Respondent father was very self-centered and exhibited difficulty understanding or responding to others' needs. Further, he was emotionally inaccessible and compensated for inadequacies by being aggressive. Respondent father had "a general personality immaturity" and a deep sense of personal inferiority. Dr. Bouchard diagnosed respondent father with dysthymic disorder, indicating that he had a history of chronic depression. There was also evidence of cannabis dependence. Respondent father did not have the personality features significant enough to diagnose a personality disorder, although features of paranoia and narcissism were present. Dr. Bouchard noted a number of stress factors that contributed to his level of functioning, such as involvement in the child welfare system, separation from his children, a volatile relationship with respondent mother, and problems with substance abuse.

In Dr. Bouchard's opinion, the children should not be returned to respondent father's care. The bonding assessment revealed a lack of attachment to the children. It also revealed a lack of initiation of affection, attention, and focus on the children. Dr. Bouchard was concerned about respondent father's capacity to provide safe and adequate discipline and about the children's exposure to drug use. She noted his history of cannabis dependence and his recent use of the drug. Further, she was concerned about respondent father's inability to understand the children's developmental and emotional needs. While respondent father had previously been involved in parenting classes, he did not consistently attend sessions, and reports revealed a lack of progress. Dr. Bouchard opined that his parenting skills would not improve in a reasonable period of time.

Dr. Bouchard administered the same tests to respondent mother on September 30, 2002. The mental status exam revealed that

respondent mother was fully oriented to reality and that there were no significant problems that would prevent participation in the assessment. In terms of cognitive abilities, respondent mother's IQ score was 74, placing her in the borderline range of intellectual functioning. There was no significant difference between her verbal and her performance scaled scores, indicating that her skills were fairly evenly developed. However, she was unable to complete the Rotter Incomplete Sentences Test, the Rorschach Ink Blot Test, or the Symptoms Checklist. On the Wide Range Achievement Test, respondent mother scored below average. She obtained a reading score of third-grade level, a spelling score of fifth-grade level, and an arithmetic score of fourth-grade level. Finally, her current global functioning score was 35 out of 100, indicating that she had some impairment in her daily functioning.

In terms of personality functioning, the tests revealed a high degree of personality disturbance, extreme personality disorganization, and poor contact with reality. There were indications of poor impulse control and inadequate social judgment. Respondent mother exhibited high impulsiveness and significant immaturity and was very reluctant to show her feelings or trust others. Her symptoms and problems were consistent with a diagnosis of chronic depression and intermittent explosive disorder. In addition, she had trouble functioning independently and had dependent personality disorder. The stress factors relevant to her situation included the child welfare system, the separation from her children, and the recent separation from respondent father.

In Dr. Bouchard's opinion, respondent mother was unable to successfully and safely care for the children. This opinion was based on respondent mother's personality disorganization, her passivity in responding to the children, the children's lack of a bond with her, and her inability to protect the children from danger. Although respondent mother could articulate appropriate child discipline techniques, she failed to apply them. Dr. Bouchard had concerns about respondent mother's cognitive limitations, which were further impaired by disorganized emotional functioning. In her opinion, respondent mother's parenting abilities would not improve to the level where she would be able to successfully parent a child.

Dr. Bouchard indicated that no services or counseling would aid in remediating respondents' abilities to parent because neither respondent was able to take responsibility for why the children were removed from their care. When questioned about respondent mother's ability to care for herself independent of respondent father, Dr. Bouchard stated that respondent mother had been able to maintain an apartment and periodically work.

On cross-examination, Dr. Bouchard admitted that, of all the tests administered, only three were objective: the IQ test, the Symptoms Checklist, and the Wide Range Achievement Test. Moreover, the subjective tests are criticized for being "open to interpretation." Dr. Bouchard was aware of respondents' frustration with the system and the caseworker, and she admitted that respondent father's problems with respect to the Rorschach Ink Blot Test could have resulted from defensiveness stemming from his frustration with the system. Dr. Bouchard also admitted that respondent mother's frustration with the caseworker and the overall situation could be factors in explaining why she was reluctant to show her feelings and trust others.

With respect to her evaluation, Dr. Bouchard did not observe any interaction between respondents and the children outside of the one-hour observation session. Moreover, during the session, she observed respondent mother hold Cortrell on her lap for "quite some time" and feed him. She also observed respondent father encourage Cornica and Cortrell to hug and kiss him, and both children "smiled and cuddled" with him for a short time. Last, Dr. Bouchard stated that respondent mother anticipated that DCFS would assist her in locating a more suitable apartment if the children were returned to her.

The State then introduced into evidence an 85-page group exhibit taken from the court files in the case.

Paternal grandmother Hattie Jackson testified on behalf of respondents. Jackson stated that she observed three visits between respondents and Cornica and Cortrell. At the visits, Cornica and Cortrell greeted respondents by hugging or kissing them. Respondents got up to hug the children and give them snacks. Cornica and Cortrell appeared to be happy during the visits. They sat on respondents' laps, played games with them, and walked with them down the hall or outside. Cornica and Cortrell referred to respondents as "[m]omma and daddy" and told them that they loved them. When it was time to leave, respondents walked the children to the car and kissed them good-bye.

Maternal grandmother Patricia Larry testified that she had been to more than 20 visits with respondent mother and the children. The visits occurred once a month. At the DCFS office, the visiting room was not very large and contained lots of toys. When the children entered the room, respondents always got up to hug and kiss them. Respondents brought food to the visits, played games with the children, and watched them sing and dance. Cornica and Cortrell referred to respondents as "mom and dad." In addition, respondent mother used appropriate discipline techniques, such as time-outs. When it was time to leave, the children hugged and kissed respondents

good-bye. At the most recent visit, two weeks prior, respondents brought birthday cake and food for Cornica's birthday.

Respondent father testified that he was the father of Cornica and Cortrell. He described his relationship with his primary caseworker, Marcia Staggs, as negative. Every time he would be on the verge of completing the tasks assigned, she would come up with another three or four tasks. Respondent father did not trust Staggs, because she indicated that he was "not getting his kids back anyway."

Respondent father visited the children for two hours once a month. When the children entered the room, he greeted them with hugs and kisses. Cornica referred to respondent father as "dad," and Cortrell referred to him as "poppie." During the visits, respondents talked to the children, asked how they were doing in school, and told them that they missed them and loved them. Cornica and Cortrell would sit on respondents' laps and hug and kiss respondents. Respondent father would push them around the room on little bicycles. Respondent father admitted that, at times, the visits got out of control, with six children in a small room. At the end of each visit, everyone hugged and kissed one another. Sometimes, Cornica would cry.

Respondent father did not trust Dr. Bouchard, because she was appointed by Staggs. Staggs told him that he needed to get an evaluation to determine whether he was capable of being with his children. Respondent father did not understand the purpose of the Rorschach Ink Blot Test or the Rotter Incomplete Sentences Test and thought they were "stupid." Respondent father testified that he and respondent mother had been attending parenting classes for the past two years. As a result of the classes, he learned to be more in tune and open to his children's problems. Respondent father stated that he could rely on his mother to help with the children.

On cross-examination, respondent father stated that he had abused Cornica a long time ago, but that he had apologized to her for his behavior. Although he still "hurt" over what happened, he had accepted what he had done and wanted to restore the bond between them. In the parenting classes, he learned how to manage his anger rather than take it out on the children.

Respondent mother testified that the visits occurred monthly. When Dr. Bouchard observed one visit, she remained behind a two-way mirror. At the beginning of each visit, everyone hugged and kissed each other. According to respondent mother, Cornica and Cortrell often ran to respondent father, sat on his lap, and cuddled with him. During the visits, the children would refer to them as "mom and dad" and hug and kiss them. Respondent mother used time-outs when the children misbehaved.

Respondent mother testified that her relationship with the original caseworker was good. However, her relationship with the new caseworker, Staggs, was not. Staggs discouraged respondent mother by telling her one thing in private and saying something much different in court. For instance, Staggs informed her that her progress was satisfactory, but then told the court that she was not progressing. In addition, respondent mother tried to complete the tests for Dr. Bouchard's parenting assessment, even though she was frustrated and tired. She did not understand the purpose behind the Rorschach Ink Blot Test or the projective drawings test. Respondent mother denied that there were holes in the walls and that she lacked furniture when Dr. Bouchard visited the home. Respondent mother had just bought new furniture for the living room and the bedroom, but had thrown away some old beds. Dr. Bouchard was correct that the door knob was damaged. Respondent mother stated that she had the mental ability to parent her children, nurture them, and provide appropriate discipline. Prior to DCFS involvement, she worked, took the four oldest children to school, and found a baby-sitter for Cornica and Cortrell.

The trial court determined that the State had proved by clear and convincing evidence that respondents were unfit as to all six children. Specifically, the court found that they were unable to discharge their parental responsibilities, due to mental impairment, mental illness, mental retardation, or developmental disability, and that there was sufficient justification to believe that such inability would extend beyond a reasonable time. In the court's view, Dr. Bouchard offered competent evidence that respondent mother possessed a borderline IQ of 74 and suffered from chronic depression, intermittent explosive disorder, and dependent personality disorder. Further, respondent father suffered from low cognitive ability, substance abuse issues, and depression. Based on this evidence, "coupled with the history of these minor children through the system," the court concluded that respondents' inability to discharge their parental duties would continue beyond a reasonable time.

After finding respondents unfit, the trial court found that it was in the best interests of Cornica and Cortrell to terminate respondents' parental rights. Respondents filed a motion for a new trial, which the court denied. Respondents' timely notice of appeal followed.

## II. ANALYSIS

In *Santosky v. Kramer*, 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982), the Supreme Court declared that parents' interests in the "care, custody, and management" of their children is a fundamental

liberty interest protected under the fourteenth amendment. *Santosky*, 455 U.S. at 753, 71 L. Ed. 2d at 606, 102 S. Ct. at 1394-95. The termination of parental rights is an extraordinary measure, given the superior rights of parents, against the rights of others, to raise their children. *In re S.R.*, 326 Ill. App. 3d 356, 360 (2001). It constitutes a permanent and complete severance of the parent-child relationship. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). Accordingly, a higher evidentiary standard must be applied to reduce the risk that parents' fundamental rights to their children will improperly be terminated. *Santosky*, 455 U.S. at 769, 71 L. Ed. 2d at 616-17, 102 S. Ct. at 1403. Before a state may completely and irrevocably sever the rights of parents in their children, due process requires that the state support its allegations by at least clear and convincing evidence. *Santosky*, 455 U.S. at 747-48, 71 L. Ed. 2d at 603, 102 S. Ct. at 1391-92.

Respondents argue on appeal that the trial court erred in finding them unfit. In order to reverse a trial court's finding that there was clear and convincing evidence of parental unfitness, we must conclude that this finding was against the manifest weight of the evidence. *In re M.M.*, 303 Ill. App. 3d 559, 565 (1999). A decision is against the manifest weight of the evidence only where the opposite result is clearly evident or where the determination is unreasonable, arbitrary, and not based on the evidence presented. *In re S.R.*, 326 Ill. App. 3d at 360-61. In determining whether the trial court's finding is against the manifest weight of the evidence, we are reminded that each case concerning parental unfitness is *sui generis*. *In re S.R.*, 326 Ill. App. 3d at 361.

■ Respondents were found unfit under section 1(D)(p) of the Act, which defines unfitness as follows:

"(p) [i]nability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness or mental retardation *** and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West 2002).

In order to prove a parent unfit under section 1(D)(p) of the Act, the State must (1) present competent evidence that the parent suffers from a mental impairment, mental illness, or mental retardation sufficient to prevent the discharge of normal parental responsibilities; and (2) present sufficient evidence to conclude that the inability will extend beyond a reasonable time period. *In re M.M.*, 303 Ill. App. 3d at 566.

■ We conclude that the State failed to prove by clear and convinc-

ing evidence that respondents were unfit under section 1(D)(p). Specifically, the State failed to establish that respondents had mental inabilities sufficient to prevent them from discharging normal parental duties. We note that the State's case rested almost entirely on the testimony of one expert, Dr. Bouchard. In Dr. Bouchard's opinion, respondents were unable to successfully and safely care for their children, and their parenting abilities would not improve over a reasonable amount of time. However, Dr. Bouchard's findings, which were based on only three interactions with respondents, did not constitute clear and convincing evidence of respondents' unfitness.

On January 7, 2002, Dr. Bouchard conducted a "parenting capacity assessment," which consisted of a one-hour parent-child observation session and an individual interview with each parent. At the beginning of the parent-child session, Dr. Bouchard observed the children greet, approach, and hug respondent mother, but not respondent father. In addition, she stated that respondents were extremely passive throughout the session and got out of their chairs only once. However, Dr. Bouchard also observed respondent father encourage Cornica and Cortrell to hug and kiss him, and both children "smiled and cuddled" with him for a short time. Further, Dr. Bouchard admitted that, during the session, respondent mother fed Cortrell and held him on her lap for "quite some time." Although Dr. Bouchard described the children's behavior as "pretty chaotic," the observation room was small given the size of respondents' family, it contained lots of toys, and the children saw each other only once a month. Moreover, Dr. Bouchard never observed any interaction between respondents and the children outside of the one-hour observation.

With respect to the clinical interviews, Dr. Bouchard found that respondents lacked awareness of a child's emotional needs, knowledge of average child development, and knowledge of the children's interests and concerns. However, respondents were both oriented to reality, aware of the circumstances of the assessment, and capable of participating in the interview process. In addition, they were able to identify appropriate disciplinary measures, such as time-outs and withholding privileges.

A few days later, Dr. Bouchard observed respondents in their three-bedroom apartment. Although she testified that it was not large enough to accommodate six children, she admitted that respondent mother anticipated that DCFS would assist her in locating a more suitable apartment if the children were returned to her. While the outlets were not covered, no children were living in the apartment at the time of the inspection. Moreover, Dr. Bouchard noted that the

apartment was "essentially clean," with a working microwave and refrigerator.

Dr. Bouchard's final interaction with respondents occurred approximately nine months later, when she administered a battery of tests. Dr. Bouchard admitted that, of all the tests administered, only three were objective: the IQ test, the Symptoms Checklist, and the Wide Range Achievement Test. Further, the subjective tests are criticized for being "open to interpretation." Additionally, she admitted that respondents' frustration with the caseworker and the overall situation could have been a factor regarding their performances on the subjective tests.

Based on the tests, Dr. Bouchard determined that respondent father was functioning below average, scoring in the extremely low range of intellectual functioning with an IQ score of 69. Due to his limited verbal ability, he was unable to complete some of the tests. Dr. Bouchard further determined that respondent father had a history of chronic depression and problems with substance abuse. In addition, she found evidence of poor impulse control, "general personality immaturity," self-centeredness, and emotional inaccessibility. However, Dr. Bouchard noted that respondent father satisfactorily completed the Symptoms Checklist and the Rotter Incomplete Sentences Test. Moreover, he did not have personality features significant enough to diagnose a personality disorder.

Respondent mother scored in the borderline range of intellectual functioning, with an IQ score of 74. Dr. Bouchard diagnosed respondent mother as suffering from chronic depression, intermittent explosive disorder, and dependent personality disorder. However, when questioned about respondent mother's ability to care for herself independent of respondent father, Dr. Bouchard stated that respondent mother had been able to maintain an apartment and periodically work. According to Dr. Bouchard, the testing revealed extreme personality disorganization, high impulsiveness, significant immaturity, and reluctance to trust others. However, there was no significant difference between her verbal and her performance scaled IQ scores, indicating that her skills were fairly evenly developed. Further, Dr. Bouchard admitted that respondent mother's frustration with the caseworker and the overall situation could be a factor in explaining why she was reluctant to show her feelings or trust others.

The only other evidence provided by the State at the fitness hearing was an 85-page exhibit of court documents relating primarily to the four minors who are not subjects of this appeal. The record reveals that both C.L., born December 25, 1990, and T.G., born November 26, 1991, were adjudicated neglected and made wards of the court on

March 31, 1993. In addition, C.G., born August 15, 1993, was adjudicated neglected and made a ward of the court on June 8, 1998. Finally, K.B., born September 25, 1994, was adjudicated neglected and made a ward of the court on August 24, 1999. While the trial court relied in part on these court documents in finding respondents unfit as to the six minors, we note that the exhibit does not pertain to Cortrell and contains only one reference to Cornica

In short, the evidence presented by the State is insufficient to satisfy the requirements of section 1(D)(p). Admittedly, Dr. Bouchard's findings revealed that respondents possess low IQs, and this fact undoubtedly affects their parenting skills. However, a low IQ does not automatically translate into an inability to discharge parental responsibilities. See *In re A.J.*, 269 Ill. App. 3d 824, 827-28 (1994) (section 1(D)(p) of the Act does not envision that all parents with a "designated mental disability" will have their parental rights terminated; instead, the Act affects only those parents who cannot discharge their parental responsibilities due to those disabilities and whose inability to do so will extend beyond a reasonable time). Moreover, based on the evidence before us, we are not convinced that respondents' behavior during the observation session or their low test scores necessarily conveys an inability to parent. See *Santosky*, 455 U.S. at 753, 71 L. Ed. 2d at 606, 102 S. Ct. at 1394-95 (the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State").

Significantly, many of the cases concerning section 1(D)(p) involve parents with severe personality disorders that are not present in this case. See *In re M.F.*, 326 Ill. App. 3d 1110, 1114 (2002) (mother was diagnosed as schizophrenic and attempted suicide); *In re A.J.*, 269 Ill. App. 3d at 825-26 (mother hospitalized at various times for her psychiatric condition/mental illness); *In re J.A.S.*, 255 Ill. App. 3d 822, 824 (1994) (mother was diagnosed as chronic schizophrenic, disorganized type); *In re K.S.T.*, 218 Ill. App. 3d 431, 432-33 (1991) (mother suffered from paranoid schizophrenia).

Conversely, in *In re M.W.*, 199 Ill. App. 3d 1050 (1990), the parents had no medically diagnosed mental impairment but possessed IQ scores nearly identical to respondents'. Despite the mother's IQ of 75 and the father's IQ of 68, as well as expert testimony that their low IQs and lack of parenting skills were so severe that they necessitated the termination of parental rights, the court concluded that the State failed to meet its burden of proving by clear and convincing evidence that the parents had mental inabilities sufficient to prevent them

from discharging their normal parental responsibilities. *In re M.W.,* 199 Ill. App. 3d at 1055-56. While we express no opinion as to the standard of mental inability or mental condition that is required in order to be found unfit under section 1(D)(p), we nevertheless determine that the facts in this case are insufficient.

Essentially, the State's case hinged on the opinion of one clinical psychologist. While we appreciate the inherent difficulty involved in cases involving the termination of parental rights, Dr. Bouchard's opinion was based on a total of three interactions with respondents. While Dr. Bouchard offered several broad conclusions based on these three interactions, some of her findings were contradicted by four witnesses. Specifically, paternal grandmother Jackson and maternal grandmother Larry testified about respondents' level of interaction with the children at the monthly visits and indicated that a bond existed between respondents and Cornica and Cortrell. Further, Dr. Bouchard admitted that some of the tests relied upon were subjective, that respondents were frustrated with the caseworker and the overall situation, and that her observation of respondents' interaction with the children lasted no more than one hour. Irrespective of Dr. Bouchard's qualifications or competency, which respondents do not contest, the field of psychology is uniquely subject to interpretation. While relying exclusively on one expert may be appropriate in some cases, the State failed to meet its burden here. With the termination of parental rights hanging in the balance, we cannot say that Dr. Bouchard's opinion constituted clear and convincing evidence that respondents had mental inabilities sufficient to prevent them from discharging their normal parental responsibilities. To be content with less than "clear and convincing evidence" would counteract the higher evidentiary standard that ensures that parents' fundamental rights to their children will not be improperly terminated. See *Santosky,* 455 U.S. at 769, 71 L. Ed. 2d at 616-17, 102 S. Ct. at 1403. As the trial court recognized, "[t]his is not an easy decision for the court. Both of these parents clearly love their children."

As a final matter, we take this opportunity to address an issue regarding our standard of review. Case law is clear that, in order to reverse a trial court's finding that there was clear and convincing evidence of unfitness, we must conclude that this finding was against the manifest weight of the evidence. In order to conclude that a decision is against the manifest weight of the evidence, the opposite result must be clearly evident or the decision must be unreasonable, arbitrary, and not based on the evidence presented. *In re S.R.,* 326 Ill. App. 3d at 360-61. However, in cases such as this involving the termination of parental rights, we propose that our supreme court

consider replacing the "manifest weight" standard of review with the bifurcated system adopted in *People v. Sorenson*, 196 Ill. 2d 425 (2001), which concerned a motion to suppress. This standard of review bifurcates the issues, with factual findings reviewed for clear error, while reserving *de novo* review for the ultimate legal ruling. *Sorenson*, 196 Ill. 2d at 431. Thus, rather than determining that the opposite result was clearly evident or that the decision was unreasonable, courts would review the trial court's findings with great deference but review *de novo* the ultimate legal ruling of whether the State met its burden of presenting clear and convincing evidence of unfitness. Accordingly, while we hold that the trial court's finding of unfitness was against the manifest weight of the evidence under the currently recognized standard of review, it is our position that the bifurcated system more accurately reflects the type of review appropriate for these cases.

For the above reasons, we reverse the judgment of the circuit court of Lake County finding respondents to be unfit and terminating respondents' parental rights to Cornica and Cortrell.

Reversed.

BYRNE, J., concurs.

JUSTICE KAPALA, dissenting:

I cannot agree that the trial court's judgment in this case was against the manifest weight of the evidence; therefore, I respectfully dissent.

Preliminarily, it is important to clarify respondents' appellate contentions. Respondents' first appellate contention is that the trial court erred in finding respondents unfit. Respondents' second appellate contention is that the trial court improperly terminated their parental rights. In regard to their first appellate contention, respondents are not claiming that the ultimate opinion articulated by Dr. Bouchard is inadequate to support the findings of unfitness. Respondents' focus is narrower. They argue that the trial court erred in receiving into evidence Dr. Bouchard's ultimate opinion as to fitness, because the facts adduced at the fitness hearing were insufficient to support that opinion. In short, respondents' first appellate contention attacks the basis for Dr. Bouchard's opinion, not its sufficiency if accepted. As such, I believe that the majority inappropriately raises an issue that respondents have waived under Supreme Court Rule 341(e)(7) (210 Ill. 2d R. 341(e)(7) (points not argued on appeal are waived)) and reverses the trial court by concluding that "Dr. Bou-

chard's findings \*\*\* did not constitute clear and convincing evidence of respondents' unfitness" (351 Ill. App. 3d at 567). It is not the function of this court to search the record for grounds upon which to base a reversal. *Jacobs v. Mundelein College, Inc.*, 256 Ill. App. 3d 476, 480 (1993). I would proceed to consider the merit of the contentions respondents do raise on appeal.

Respondents' first appellate contention is that the trial court's finding that respondents are unfit persons was against the manifest weight of the evidence because Dr. Bouchard's opinion that respondents are unfit persons under section 1(D)(p) was based on inaccurate facts and questionable tests. Respondents support their first appellate contention with three arguments: (1) that Dr. Bouchard's testimony regarding her assessment of the parent-child observation session was contradicted by four witnesses called by respondents at the fitness hearing; (2) that the Rorschach Ink Blot Test and the Rotter Incomplete Sentences Test "are subjective, severely criticized and open to any interpretation by the interviewer"; and (3) that respondents' defensiveness, as a result of being referred to Dr. Bouchard by their caseworker, whom they neither trusted nor liked, had a "likelihood" of affecting Dr. Bouchard's findings. For the following reasons, I would reject these three arguments.

With respect to fitness determinations, it is up to the trial court to make factual findings and to assess the credibility of witnesses; we will not reweigh the evidence on review. *In re T.Y.*, 334 Ill. App. 3d 894, 908 (2002). We defer to the trial court's factual findings and credibility determinations during a fitness hearing and will reverse them only if they are against the manifest weight of the evidence. *In re Jamarqon C.*, 338 Ill. App. 3d 639, 649 (2003). "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *In re C.N.*, 196 Ill. 2d 181, 208 (2001). At the fitness hearing, the trial court heard the testimony of respondents and their mothers, who all had interpretations of the events that occurred at the visits between respondents and the children that differed from Dr. Bouchard's. The trial court was entitled to accept Dr. Bouchard's version and reject those of respondents and their mothers. It would certainly be reasonable to conclude that these four witnesses were biased in favor of respondents. The fact that Dr. Bouchard's testimony on this point was contradicted in this manner does not make it clearly evident that her account of the parent-child observation session was inaccurate.

Dr. Bouchard admitted that the Rorschach Ink Blot Test and the Rotter Incomplete Sentences Test are criticized for being subjective. However, contrary to respondents' assertion, there is no indication in

the record that these tests have been "severely criticized." Nevertheless, the trial court was aware of this criticism and I fail to see how it nullifies Dr. Bouchard's opinion. The trier of fact is permitted to accept an expert's opinion despite efforts to impeach such testimony. See *Jarke v. Jackson Products, Inc.*, 282 Ill. App. 3d 292, 298 (1996). Moreover, Dr. Bouchard's opinion that respondents suffer from mental impairments and mental illnesses preventing them from discharging their normal parental responsibilities was based on more than these two tests. For example, in addition to the clinical interviews and the parent-child observation session, Dr. Bouchard's opinion was based on the results of three objective tests: the IQ test, the Symptoms Checklist, and the Wide Range Achievement Test.

Dr. Bouchard also conceded that respondents had expressed frustration with the system and the caseworker who referred respondents to her. Dr. Bouchard explained her views as to the effect of these circumstances on various test results. Contrary to respondents' assertion, however, Dr. Bouchard conceded only that respondents' defensiveness "could have" affected the test results, not that it was likely. The trial court was thereby made aware of the potential problems with various test results and nevertheless chose to accept Dr. Bouchard's opinion. The possibility that frustration with the system affected the outcomes of certain tests given to respondents does not convince me that the trial court should have rejected those test results or the opinion that was partially based thereon. See *Jarke*, 282 Ill. App. 3d at 298. A finding that the test results were part of a valid basis upon which to opine that respondents had mental impairments and mental illnesses making them unable to discharge their parental duties was not against the manifest weight of the evidence, because the opposite conclusion is not clearly evident.

Contrary to respondents' position and the majority's conclusion, in my judgment the facts of this case provided ample support for Dr. Bouchard's opinion. "It is well settled that, in order to find a parent unfit under section 1(D)(p) of the Act, the State must (1) present competent evidence that the parent suffers from a mental impairment, mental illness, or mental retardation sufficient to prevent her from discharging a parent's normal responsibilities; and (2) there must be sufficient evidence to conclude that the inability will extend beyond a reasonable time period." *In re M.M.*, 303 Ill. App. 3d 559, 566 (1999). The trial court's finding of unfitness will not be set aside unless it is against the manifest weight of the evidence. *M.M.*, 303 Ill. App. 3d at 565. A finding is against the manifest weight of the evidence when the opposite result is clearly evident from a review of the evidence. *M.M.*, 303 Ill. App. 3d at 565.

Dr. Bouchard testified that respondent father had an IQ of 69 which, according to the Wechsler Adult Intelligence Scale-III classification, is in the extremely low range of intellectual functioning. According to Dr. Bouchard, respondent father reads and spells at a third-grade level and performs arithmetic at a fifth-grade level. Respondent father scored 45 of a possible 100 on the global functioning scale, indicating impairment in daily functioning. Dr. Bouchard also diagnosed respondent father with dysthymic disorder, early onset, a mental disorder classified in the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV). See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 345 (4th ed. 1994). Dr. Bouchard explained that her diagnosis of respondent father as having dysthymic disorder means that, in her expert opinion, he has a history of chronic depression. Dr. Bouchard opined that, within a reasonable degree of psychological or clinical psychological certainty, respondent father was unable to parent due to his mental disorder and low level of intellectual functioning.

With respect to respondent mother, Dr. Bouchard testified that she has a full-scale IQ of 74, placing her in the borderline range of intellectual functioning. Respondent mother reads at a third-grade level, spells at a fifth-grade level, and performs arithmetic at a fourth-grade level. Her global functioning score of 35 out of 100 indicated impairment in her daily functioning. Dr. Bouchard diagnosed respondent mother as having the mental disorders of chronic depression (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 345 (4th ed. 1994)), intermittent explosive disorder (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 609 (4th ed. 1994)), and dependent personality disorder (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 665 (4th ed. 1994)). Dr. Bouchard opined that, within a reasonable degree of psychological or clinical psychological certainty, respondent mother was unable to successfully and safely care for the children because of her borderline intellectual functioning and the very significant personality disorganization noted in the psychological testing. Dr. Bouchard also opined that neither respondent is capable of taking care of one child, let alone six children. Dr. Bouchard opined further that there is no prospect of respondent mother's parenting abilities improving markedly in the near future.

The DSM-IV is based on clinical research and is nationally recognized as a text of mental disorders. *In re Detention of Hughes*, 346 Ill. App. 3d 637, 644 (2004). According to Dr. Bouchard, a licensed

clinical psychologist, each respondent meets the criteria for dysthymic disorder under the DSM-IV. Respondent mother also meets the criteria for intermittent explosive disorder and dependant personality disorder under the DSM-IV. Under section 1—119 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/1—119 (West 2002)), a person is mentally ill if the person has an organic, *mental*, or emotional *disorder* that substantially impairs the person's thought, perception of reality, emotional process, judgment, behavior, or ability to cope with the ordinary demands of life. *People v. Lang*, 113 Ill. 2d 407, 453 (1986). Dr. Bouchard also testified to respondents' low levels of intellectual functioning. Although the evidence of respondents' mental functioning does not establish mental retardation, "[a] finding of unfitness can be based on a respondent's mental impairment sufficient to prevent her from discharging a parent's normal responsibilities." (Emphasis omitted.) *M.M.*, 303 Ill. App. 3d at 567.

While Dr. Bouchard's opinion was certainly subject to criticism on the ground that it was based on limited exposure to respondents and their children, I do not believe that the opposite conclusion is clearly evident. Our supreme court has stated that "[t]he requirement that the evidence of mental illness be 'competent' refers to the type of evidence, not the quantum." *In re R.C.*, 195 Ill. 2d 291, 302 (2001). The trial court was free to accept Dr. Bouchard's opinion, which was uncontroverted by another expert, and the trial court's finding that respondents were unfit persons under section 1(D)(p), based upon that opinion, was not against the manifest weight of the evidence.

For the foregoing reasons, I respectfully dissent from the judgment of the majority, and I would proceed to address respondents' second appellate contention, that is, whether the trial court abused its discretion in determining that it was in the minors' best interest to terminate respondents' parental rights.