# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re S.L.*, 2012 IL App (5th) 120271

---

| | |
|---|---|
| Appellate Court Caption | *In re* S.L., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. JULIA F., Respondent-Appellant). |
| District & No. | Fifth District<br>Docket No. 5-12-0271 |
| Filed | November 28, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | An order finding respondent to be an unfit parent under sections 1(D)(m)(iii) and 1(D)(p) of the Adoption Act was reversed and the cause was remanded, since the State failed to comply with section 1(D)(m)(iii) by failing to specify the nine-month period or periods in which it claimed respondent did not make reasonable progress toward the return of her child and the finding that she was unfit due to mental impairment pursuant to section 1(D)(p) was contrary to the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Marion County, No. 07-JA-40; the Hon. Michael D. McHaney, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Bill J. Milner, Craig W. Griffin (Law Graduate, Certified under Supreme Court Rule 711), of Law Office of Bill J. Milner, of Salem, for appellant.

Matt Wilzbach, State's Attorney, of Salem (Patrick Delfino, Stephen E. Norris, and Rebecca E. McCormick, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE STEWART delivered the judgment of the court, with opinion.
Justices Goldenhersh and Spomer concurred in the judgment and opinion.

## OPINION

¶ 1    On January 18, 2011, the State filed a petition for termination of the parental rights of Bruce V. and Julia F., the parents of S.L., a minor child. The father did not participate in the proceedings below and has not filed a brief in this court. On November 30, 2011, the State filed an amended petition for termination of parental rights, alleging four grounds for unfitness against Julia: (1) failure to make reasonable efforts to correct the conditions that were the basis for the child's removal (750 ILCS 50/1(D)(m)(i) (West 2010)); (2) failure to make reasonable progress toward the return of her child within nine months after the adjudication of neglect, being the period of November 29, 2007, to August 29, 2008 (750 ILCS 50/1(D)(m)(ii) (West 2010)); (3) failure to make reasonable progress toward the return of the child during any nine-month period after the end of the initial nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(iii) (West 2010)); and (4) inability to discharge parental responsibilities as supported by competent evidence from a licensed clinical psychologist of mental impairment with sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period (750 ILCS 50/1(D)(p) (West 2010)). After an evidentiary hearing, the trial court entered an order finding that the State had not proved the first two grounds but had proved Julia to be unfit under the final two grounds alleged in the amended petition.

¶ 2    Julia appeals from the order of the circuit court of Marion County finding her to be an unfit parent under sections 1(D)(m)(iii) and 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(m)(iii), (D)(p) (West 2010)). We reverse and remand.

¶ 3                    BACKGROUND

¶ 4    S.L. was born to Julia on May 3, 2002. On September 11, 2007, the State filed a petition for adjudication of wardship, alleging that S.L. was neglected in that she was in an environment injurious to her welfare because Julia was not protecting her physical welfare (750 ILCS 50/1(D)(g) (West 2006)). On the same date, the court entered an order for temporary custody, finding probable cause existed to believe that S.L. had been abused or

neglected due to being dirty and having bites and bruising on her body. The Department of Children and Family Services (DCFS) was granted temporary custody of S.L.

¶ 5 On January 3, 2008, the court entered a dispositional order finding S.L. to be neglected, making her a ward of the court, and awarding DCFS custody and guardianship. At each of the permanency hearings after entry of the dispositional order, the goal for the family was for S.L. to return to Julia within 12 months. On July 21, 2010, the goal was changed to substitute care pending court determination of termination of parental rights. On January 18, 2011, the State filed the initial petition to terminate parental rights, and it filed an amended petition on November 30, 2011.

¶ 6 On February 24, 2012, the court conducted an evidentiary hearing on the amended petition to terminate parental rights. Although the parental rights of S.L.'s father were addressed at this hearing, we will not relate those facts since he is not participating in this appeal. The State called Frank Kosmicki, a licensed clinical psychologist, to testify. Kosmicki testified that he interviewed Julia for 50 to 60 minutes on April 18, 2011. As part of his evaluation, he also reviewed a psychological evaluation report drafted by Fred Klug in 2008, an integrated assessment prepared by DCFS on August 26, 2010, an administrative case review dated September 10, 2010, and a DCFS family service plan dated March 28, 2011.

¶ 7 Kosmicki testified that Julia informed him about her past history of abuse, which included being beaten, raped, and threatened to be killed at age eight by her mother's boyfriend. She was placed in foster care at age 12. She said that she had been hospitalized nine times between the ages of 10 and 14 for running away and being defiant. She was in special education in grade school and was expelled from school in the tenth grade. She reported using drugs from age 13 until she was 17 years old. She told Kosmicki that she had not drunk any alcohol since she was 23 years old. When she was 17 years old, she began dating a 30-year-old man, whom she married when she was 18 years old. She told Kosmicki that her first husband was physically abusive and beat her so badly once that he knocked out her teeth, causing her to be hospitalized and to need dentures. She said that her second marriage was to a man who was an alcoholic and physically abusive, and her third marriage was to an alcoholic.

¶ 8 Kosmicki noted that, before S.L. was born, Julia had a son, M.P., who was born on March 17, 1996, when Julia was 18 years old. She explained to Kosmicki that she gave up custody of M.P. to her mother when he was young because she was trying to get out of her marriage, and her husband had threatened M.P. Julia regained custody of M.P. in 2008 because her mother became incompetent and began living in a nursing home. DCFS has not intervened or tried to remove M.P. from Julia's custody, and he remained in her custody at the time of the termination hearing.

¶ 9 At the time of the interview, Julia was not in a relationship with anyone. Kosmicki testified that Julia "said she was single and planned on staying single, that she wasn't looking

for a relationship." Kosmicki testified that Julia was unemployed when he interviewed her.[1] She was not on any medication at the time of the interview, but at times had been prescribed several different antidepressants and antipsychotic medications. Julia told him she had not taken any of these medications for two years because they made her feel like a zombie. She reported having several symptoms of posttraumatic stress disorder (PTSD), such as flashbacks, nightmares, and reactivity to cues that reminded her of past traumas. However, at the time of the interview, she felt that she was doing much better and that her judgment had improved.

¶ 10    Kosmicki testified that he conducted several diagnostic tests on Julia. From those tests, he determined that her IQ was 74, which put her in the borderline range just above those who are mentally retarded. On the Minnesota Multiphasic Personality Inventory–2–Restructured Form test, he testified that Julia's answers indicated that she was trying to "fake good" or show herself in a false positive light. Kosmicki also said that the "only clinical elevation of note was an elevation on a scale assessing antisocial behaviors," which was consistent with her early history. Kosmicki administered a parenting relationship questionnaire, but he assigned very little significance to the findings from that test because the test had not been "standardized empirically" and it measured Julia's interaction with S.L., which had been very limited since S.L.'s removal from Julia's custody.

¶ 11    Kosmicki testified that Julia met the criteria for PTSD, borderline intellectual functioning, and "a personality disorder, not otherwise specified with some dependent and borderline personality features." He did not believe she was able to discharge her parental responsibilities at the time he interviewed her. He based that conclusion partly on his diagnoses of PTSD and personality disorder and partly on her past history "of having very dangerous men in her household and exposing her daughter to dangerous things." Kosmicki recommended that, before she could be reunited with S.L., she should "get some long-term intensive therapy." He acknowledged that she was in counseling when he saw her and that he could not "determine whether or not the counseling that she had was in fact helping her." He recommended that she "be in long-term psychotherapy" and consult with a psychiatrist about the necessity of psychotropic medication for symptom management.

¶ 12    When asked how long he thought Julia would need to demonstrate that she had made sufficient changes to enable her to regain custody of S.L., he estimated that she would need "six months to a year of logistical stability, being in one place, utilities, having a home, having no arrests, having no instance of domestic violence, no substance abuse, those kinds of things." On cross-examination by Julia's attorney, Kosmicki again stated, "[A]t a bare minimum, I would recommend six months to a year maintaining [a] stable life" before S.L. could safely return home.

¶ 13    Tiffany Short, Julia's caseworker from September 2007 through June 2008, testified that she conducted an administrative case review on March 24, 2008, and discussed that service plan with Julia. Short testified that Julia's service plan required her to complete several tasks

---

[1]Julia testified that she receives supplemental security disability income, that M.P. receives survivor benefits, and that her total income from both sources is approximately $1,500 per month.

to correct the conditions that had led to S.L.'s removal. Short testified that, as of March 2008, Julia had satisfactorily completed five of the tasks assigned to her. First, Short said that Julia had completed her psychiatric assessment, was being treated by Dr. Katz, and was taking her prescribed medications. Second, Julia had been financially responsible for S.L. because she had worked through the Department of Rehabilitative Services taking care of her mother, and when her mother had to be placed in a nursing home, she was not employed, but she was receiving "SSI as well as food stamps." Third, she had obtained and maintained safe and appropriate housing. Short said that, in March 2008, Julia was in the process of moving into her own residence in Centralia. Visits with S.L. had not begun at that house yet because Julia was still trying to finish moving in. Fourth, Julia was in the process of completing a substance abuse assessment, and she had tested negative when screened for drugs. Fifth, she had satisfactorily completed the psychological evaluation by Dr. Klug on March 14, 2008.

¶ 14    Short testified that Julia was assigned four additional tasks. Short stated that Julia was rated unsatisfactory in the categories of individual mental health counseling, completing parenting classes, obtaining a bonding assessment, and completing domestic violence counseling, but Short acknowledged that the failure to complete those tasks was not Julia's fault. Short testified that Julia "seemed open to completing services." However, in Short's opinion, Julia "didn't take really any responsibility for why [S.L.] came into care." When asked for the basis of her opinion that Julia was not taking responsibility for S.L., Short answered, "Just kind of her attitude and, you know, things that she would say."

¶ 15    Dayna Harris McDaniel testified that she was employed by Catholic Social Services as Julia's caseworker from June 2008 until April 2010. When McDaniel drafted the permanency report in September 2008, Julia's overall rating was unsatisfactory. McDaniel testified that although Julia had engaged in the services, she lacked the "ability to internalize and demonstrate the learning of whatever the services were." McDaniel explained that Julia showed a lack of stability because she moved multiple times. She believed that Julia showed a lack of good judgment because she chose boyfriends who were abusive and she hung around with people who were not appropriate. Julia had completed a substance abuse evaluation and no follow-up services were recommended, and she had begun taking parenting classes.

¶ 16    McDaniel testified that, although Julia had completed a psychological evaluation with Dr. Klug and was following up with mental health counseling, McDaniel rated her as unsatisfactory on this criteria because her attendance had been sporadic and she lacked the ability to apply what she had learned. She was seeing Dr. Katz at the Angela Center and taking the medication he prescribed her for bipolar disorder and obsessive-compulsive disorder. However, around September or October 2008, Julia stopped taking her medication, saying it made her feel like a zombie. Julia was also attending individual counseling sessions with Pearce Konold, and her attendance at these sessions was better. McDaniel testified that her counselor[2] thought she was making progress, but her ability to understand and apply what she was learning was a challenge.

---

[2]She did not specify the name of this counselor.

¶ 17 McDaniel rated Julia as unsatisfactory on the requirement of obtaining and maintaining appropriate and safe housing because her residence was unclean, had rodents and cockroaches, and was too small for the number of people living there. During this time, however, Julia had no difficulty with substance abuse and had completed her parenting classes. She had not completed domestic violence counseling but had initiated PAVE (People Against Violent Environments) services to address those issues.

¶ 18 McDaniel also prepared a permanency report in March 2009. At that time, Julia had moved out of the residence she was sharing with her husband Billy due to domestic violence, and she had obtained an order of protection against him. She was working at Gilster-Mary Lee. She was not taking the medications Katz had previously prescribed to her. Katz was no longer available to treat her, and she had not yet switched to a different doctor for psychiatric review. She was still attending mental health counseling, but her attendance was sporadic. McDaniel acknowledged that Julia did not have any trouble with substance abuse at any time since S.L. came into care.

¶ 19 Julia had supervised visits with S.L. every week. McDaniel testified that she occasionally monitored those visits. She developed a checklist system to help Julia initiate appropriate interaction with S.L. during these visits. McDaniel explained that sometimes she did not consider Julia's behavior to be appropriate, such as the time that Julia called S.L. a "sexy mama." Julia had been granted unsupervised visits with S.L. for a short period of time, but due to the unsanitary condition of the home and Julia's questionable boyfriends, the unsupervised visits were suspended. In March 2009, Julia was attending individual counseling, but her counselor did not believe she was making substantial progress. However, she had completed an anger management class, and she did not require any follow-up services.

¶ 20 As of March 2009, McDaniel rated Julia's overall progress as unsatisfactory on the basis of "poor judgment, lack of stability, the situations that would put a child [S.L.'s] age at risk. The bouncing from man to man, the bouncing from home to home. Not being medicated when that's been recommended."

¶ 21 In September 2009, Julia's visitation with S.L. was decreased from twice per week to once per week, and DCFS changed its recommended goal from return home in 12 months to substitute care pending court determination of termination of parental rights. During McDaniel's oversight of Julia's case, from June 2008 through April 2010, McDaniel believed that Julia's progress was unsatisfactory and that she had not made sufficient progress toward correcting the conditions that led to S.L.'s removal. McDaniel acknowledged that Julia was willing to do what was asked of her but said that Julia did not make demonstrable improvement in her decision-making regarding her choice of paramours, who she lived with, or her interactions with S.L. McDaniel testified that Julia's efforts were reasonable, but she did not learn from her mistakes, even when McDaniel explained both the problem and the solution.

¶ 22 Rachel Kissner testified that she was Julia's foster care case manager, and she prepared a service plan review on September 6, 2011. At that time, Julia was living with her boyfriend, David Schroeter, who was employed, had children of his own, and had no

problems that concerned Kissner. Kissner acknowledged that she did not have any concerns about Julia's interactions with Schroeter's two minor daughters or about Julia's minor son, M.P., continuing to live with Julia and Schroeter. She stated that Julia had an appropriate bedroom for S.L. at her current residence. Kissner knew of nothing on the service plan that Julia still needed to complete. The only task remaining was for Julia to get her medications corrected because the medication prescribed for her had caused an allergic reaction, and she had not yet been prescribed any different medication.

¶ 23    Although Julia had completed all tasks assigned to her, Kissner rated Julia's interaction with S.L. during her twice-monthly visits as unsatisfactory because Julia "struggled with [S.L.] some as far as *** age appropriate interactions." Kissner testified about examples of what she considered inappropriate interactions. At S.L.'s birthday party, Julia got some icing from S.L.'s birthday cake on her hand and "thought it would be funny to put it on [S.L.'s] face," but instead, it upset S.L. Kissner said that S.L. "just kind of calmed herself down," and Julia explained that it was a joke and that she did not mean to upset S.L. Kissner testified about another incident that occurred in the summer. She said it was hot outside and Julia wanted to use a barrette to keep S.L.'s bangs out of her face. S.L. got mad, Julia clipped up the bangs anyway, and S.L. went to the bathroom crying about it. Julia tried to comfort S.L., but S.L. went to Kissner instead, hugging her and asking her to make Julia stop. Finally, S.L. calmed down, and Julia started playing with her.

¶ 24    Kissner also said that there was "a lack of interaction during visits" because S.L. usually had homework but never wanted to do her homework. Kissner said that Julia would help S.L. with her homework, but then "would kind of start talking about her own things." Kissner also thought that Julia was not firm enough in disciplining S.L., that she looked to Kissner to tell her what to do, but that when prompted on what to do she "was fine." Kissner acknowledged that S.L. tried to manipulate Julia and was very confused about her situation.

¶ 25    The State rested its case after presenting the above evidence. Julia's attorney moved for a directed finding on three of the State's allegations of unfitness and asked to reserve argument on the fourth, that Julia had failed to make reasonable progress toward S.L.'s return during any nine-month period after the initial nine-month period following the adjudication of neglect. The trial court denied Julia's motion as to the State's allegation that she was unable to discharge parental responsibilities extending beyond a reasonable time period as supported by competent evidence from a licensed clinical psychologist of mental impairment. The trial court took under advisement its ruling on Julia's motion that the State failed to prove that Julia had failed to make reasonable efforts to correct the conditions that were the basis for S.L.'s removal and that she failed to make reasonable progress toward S.L.'s return within nine months after the adjudication of neglect.

¶ 26    Julia presented several witnesses.

¶ 27    David Schroeter testified that he was 33 years old and worked full time at Charter Communications as a broadband technician. Julia was his girlfriend, and they lived together. They had been friends for about a year before moving in together in a four-bedroom, two-bath home that they shared with M.P. S.L.'s visits were at this house. He had two daughters who were 12 and 13 years old and who stayed with him every other weekend. If S.L. were

returned to Julia's custody, she would have a bedroom of her own. He testified that Julia interacted well with his daughters and took care of them by herself on Sundays when they were visiting and he was at work. He said he did not have any concerns about leaving his daughters with Julia, and he would not leave them with her if he had any concerns about it. He said that Julia interacted well with M.P. and that their relationship seemed to be improving because M.P. was opening up and talking to her more.

¶ 28    Connie Hoover testified that she is a friend of Julia's, that one of her sons, Christopher, is close in age to M.P., and that Christopher and M.P. spend time together at Julia's home. She was not concerned about Christopher staying overnight at Julia's house. She described Julia's house as "[v]ery, very clean." Christopher testified that M.P. is his best friend and, when he is at M.P.'s house, they usually watch TV or play card games in the living room. He said Julia was usually cooking or cleaning, "basically anything a mother does," and when she was finished with her work, she would sit down and relax.

¶ 29    M.P. testified that he was 15 years old at the time of the hearing. He said that their house is always spotless, that there is always enough food for him to eat, and that his mom takes the "best care" of him. He testified that if S.L. were allowed to come live with them, they would be "able to interact more as a family and that [they] would all be able to feel really safe knowing that she's finally home." He said he would love to get to know his "little sister."

¶ 30    The hearing was recessed until March 16, 2012. When the hearing resumed, Julia testified that since August 2007, when S.L. was removed from her custody, she had multiple caseworkers. She stated that she did not tell her caseworkers that she refused to take the psychotropic medication prescribed to her but that she preferred not to take any medications if at all possible. She said that if medication was recommended for her, she would take it because getting S.L. back was all that mattered to her. At the time of this hearing, S.L. was almost 10 years old, and M.P.'s sixteenth birthday was the day after the hearing. Julia and Schroeter had split up the week before the March 16, 2012, hearing. Julia explained that she was too focused on and concerned about getting her daughter back to be in a relationship. She said that she and Schroeter were still friends but no longer living together. She was continuing to pay the bills for the house she previously shared with Schroeter, and she testified that if she could not pay for that house on her own, she would find less expensive housing.

¶ 31    Julia testified that she had been required to attend PAVE counseling since the beginning of the case. She described PAVE counseling as learning about the warning signs of domestic violence and developing techniques to protect herself and her children from "people who are not so nice, so to say." She had received a certificate stating that she had participated in individual and group counseling through PAVE for the past two years. The certificate stated that the PAVE staff had provided enough information that Julia had the knowledge to provide a safe environment for herself and her children but that she could continue to attend counseling sessions "for emotional support and further information." Julia testified that she felt she benefitted from the PAVE counseling and that she was continuing to attend.

¶ 32    Julia said that she had completed parenting classes twice. Throughout the case, she had

always maintained contact with her caseworkers and allowed them to inspect her home anytime they asked. At the time of this hearing, she was still attending mental health counseling through CRC with Dr. Keeven, and no doctor had prescribed any medications for her. She said that she did not believe in taking medications, but when she was in pain, such as when she had sinus/nasal surgery, she took pain medication as needed. She testified that, after S.L. was removed from her, she had been prescribed Klonopin, Zoloft, Seroquel, and Geodon, "and with all those combined it was making [her] like a zombie." She said that, more recently, a doctor had prescribed medicine for her, but she had an allergic reaction to it and had to stop taking it.

¶ 33     The trial court took the case under advisement and on April 5, 2012, entered a docket sheet order granting Julia's motion for a directed finding on the State's allegations in paragraphs 9(A) and 9(B) of the amended petition for termination of parental rights. The court noted that it found Kosmicki's testimony credible and persuasive and that it had also relied on Klug's 2008 report. The court stated that it had carefully assessed the demeanor of all of the witnesses, including Julia, and had carefully considered all of the relevant evidence. The court found that the State had met its burden to prove by clear and convincing evidence that Julia met the definition of an unfit parent pursuant to paragraphs 9(C) and 9(D) of the State's amended petition for termination of parental rights. On June 11, 2012, the court entered an order terminating Julia's parental rights to S.L. Julia filed a timely notice of appeal.

¶ 34                                            ANALYSIS

¶ 35                   I. Pleading Requirements of Section 1(D)(m)(iii)

¶ 36     We first consider Julia's argument that the trial court's finding that the State proved the allegation that she had failed to make reasonable progress toward S.L.'s return during any nine-month period should be reversed because the State failed to comply with the statutory duty that it notify Julia of the specific nine-month periods that were the subject of the termination hearing. This is a purely legal question for which our review is *de novo*. *In re D.F.*, 201 Ill. 2d 476, 495, 777 N.E.2d 930, 941 (2002) (where the issue is one of statutory construction, review is *de novo*). The statute that controls this issue provides, in relevant part, as follows:

> " 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
>
>                                * * *
>
>     (m) Failure by a parent *** (iii) to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following the adjudication of neglected or abused minor ***. *** Notwithstanding any other provision, when a petition or motion seeks to terminate parental rights on the basis of item (iii) of this subsection (m), the petitioner shall file with the court and serve on the parties a pleading that specifies the 9-month period or periods relied on. The pleading shall be filed and served on the parties no later

-9-

than 3 weeks before the date set by the court for closure of discovery, and the allegations in the pleading shall be treated as incorporated into the petition or motion. Failure of a respondent to file a written denial of the allegations in the pleading shall not be treated as an admission that the allegations are true." 750 ILCS 50/1(D)(m)(iii) (West 2010).

¶ 37    Whether a statutory command is mandatory is a question of statutory construction, and the answer is a matter of legislative intent for which the statute's language is the best evidence. *People v. Robinson*, 217 Ill. 2d 43, 54, 838 N.E.2d 930, 936 (2005). The provision adding the requirement that the State file a pleading to disclose the nine-month period or periods it intends to rely on was added by Public Act 94-563, effective January 1, 2006, well before the State filed its amended petition in November 2011. The State has conceded in its brief that it did not file the required pleading to specify which nine-month period or periods it would rely on to prove Julia unfit. The State seeks to avoid the effect of its error by having us find that Julia waived this issue by not raising it in the trial court. The State's argument is not persuasive in light of the language and purpose of the statute.

¶ 38    We first note that the statute uses the term "shall" in relation to the State's obligation to file the notice pleading. Such language indicates that the State is required to comply rather than use its discretion to decide whether or not to comply. See *Read v. Sheahan*, 359 Ill. App. 3d 89, 93, 833 N.E.2d 887, 891 (2005) (use of the term "shall" in a statutory provision generally indicates a mandatory legislative intention).

¶ 39    The core purpose of this subsection is to allow the State to prove a parent unfit and thereby involuntarily terminate his or her parental rights if it proves by clear and convincing evidence that the parent failed to make reasonable progress to correct the conditions that were the basis of the child's removal during "any 9-month period after the end of the initial 9-month period following the adjudication of neglect[ ]." 750 ILCS 50/1(D)(m)(iii) (West 2010). In 2006, the legislature amended the statute to require the State to file a pleading which specifies the particular nine-month period or periods it intends to rely on to prove unfitness. Moreover, the statute now provides that "the allegations in the pleading shall be treated as incorporated into the petition or motion" by which the State seeks termination of the parent's rights. 750 ILCS 50/1(D)(m)(iii) (West 2010). Therefore, when the State seeks to terminate parental rights under this statutory provision, its allegation of unfitness must include written notice specifying the nine-month period or periods it is relying on, and this notice pleading must be served on the parties and filed with the court no later than three weeks before the discovery cutoff. The portion of the statute requiring this notice pleading is as much a part of the allegation of unfitness as the basic provision that the parent has failed to make reasonable progress toward the return of her child.

¶ 40    In a case such as this, where there were several possible nine-month periods from which the State could seek to prove unfitness, the advance notification is crucial. Unless the parent knows before the hearing which nine-month periods the State intends to rely on, the parent's ability to defend himself or herself is seriously impaired. In this case, the State's failure to comply with the notice pleading requirement was compounded at the hearing because the State did not specify which period was the basis for its allegation of unfitness, its evidence did not clear up the confusion, and the trial court did not specify which of several nine-month

periods formed the basis of its finding of unfitness on this ground.

¶ 41 A parent's right to raise his or her biological child is a fundamental liberty interest, which is protected by due process. *In re M.H.*, 196 Ill. 2d 356, 362, 751 N.E.2d 1134, 1139 (2001). Because the parent's interest is fundamental, the State's burden of proof is high; it must prove the allegation of unfitness by clear and convincing evidence. *Id.* at 365, 751 N.E.2d at 1141 (the State's burden of proof by clear and convincing evidence underscores the importance of parents' fundamental right to the control, custody, and care of their children). The statutory duty to file the notice pleading in advance of the hearing increases the likelihood that the State will have the necessary evidence to meet its burden of proof on this issue, that the parent will have an adequate opportunity to defend the allegation, and that the trial court will be able to make a fair decision as to whether or not the parent is unfit on that statutory ground.

¶ 42 Another provision of the statute also compels our conclusion that the State cannot rely on the parent's waiver of the issue to rectify its error. The legislature specified that the parent's failure to file a written denial of the allegations "shall not be treated as an admission that the allegations are true." 750 ILCS 50/1(D)(m)(iii) (West 2010). We believe that language supports our determination that the State's pleading requirement cannot be waived. We hold that the State's duty to comply with the statute's notice pleading requirement is mandatory and that the requirement is not waived by the failure of a parent to object. A contrary ruling would effectively place the burden of compliance with the statute on the parent, rather than on the State.

¶ 43 Julia argues that the State's failure to abide by the notice pleading provision of section 1(D)(m)(iii) requires us to reverse the trial court's finding of unfitness on that ground. We agree. The trial court's finding of unfitness on this allegation must be vacated because the trial court may not terminate a parent's rights on grounds not charged in the petition. *In re Gwynne P.*, 215 Ill. 2d 340, 349, 830 N.E.2d 508, 514 (2005). "The permissible grounds for finding a parent unfit are set forth in section 1(D) of the Adoption Act [citation]." *Id.* The court's statutory authority to terminate a parent's rights involuntarily "is delineated by the language of the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2002)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2002))." *Id.* at 354, 830 N.E.2d at 516. When a court exercises its authority to terminate parental rights, it must proceed within the confines of the law and has no authority to proceed except as the law provides. *In re E.B.*, 231 Ill. 2d 459, 464, 899 N.E.2d 218, 221 (2008) (quoting *People v. Brown*, 225 Ill. 2d 188, 199, 866 N.E.2d 1163, 1169 (2007)). The court is not free to reject or expand its statutory authority despite its desire or perceived need to do so. *Id.*

¶ 44 In the case at bar, the State did not comply with the notice pleading requirement of section 1(D)(m)(iii) because it did not specify the particular nine-month period or periods during which it claimed Julia failed to make reasonable progress toward S.L.'s return. As noted, section 1(D)(m)(iii) requires the State to file, in writing and three weeks before the closure of discovery, a pleading, which is to be served on the parent and other parties, specifying the nine-month period or periods it relies on to prove the parent's unfitness under this section. Since the State did not comply with the statute's notice pleading provision, the trial court could not terminate Julia's parental rights based on an allegation that was not in

-11-

conformity with the statute. Accordingly, the trial court's finding of unfitness on the State's allegation in paragraph 9(C) of the amended petition must be reversed.

¶ 45    However, the State is not required to prove every ground of unfitness alleged. "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d at 349, 830 N.E.2d at 514. Therefore, we next consider whether the trial court's finding of unfitness on the final ground alleged may be sustained.

¶ 46    II. Inability to Discharge Parental Responsibilities Due to Mental Impairment

¶ 47    Julia argues that the finding of unfitness due to mental impairment is contrary to the manifest weight of the evidence.

> "A trial court's determination that a parent's unfitness has been established by clear and convincing evidence will not be disturbed on review unless it is contrary to the manifest weight of the evidence. A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. [Citation.] In assessing whether the court's decision is contrary to the manifest weight of the evidence, a reviewing court must remain mindful that every matter concerning parental fitness is *sui generis*. [Citation.] Each case must therefore be decided on the particular facts and circumstances presented." *Id.* at 354, 830 N.E.2d at 516-17.

¶ 48    The statute controlling this issue provides that a parent may be found unfit due to an

> "[i]nability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness or an intellectual disability as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1-106 of that Code, and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West Supp. 2011).

¶ 49    "It is well settled that, in order to find a parent unfit under section 1(D)(p) of the [Adoption] Act, the State must (1) present competent evidence that the parent suffers from a mental impairment, mental illness, or mental retardation sufficient to prevent her from discharging a parent's normal responsibilities; and (2) there must be sufficient evidence to conclude that the inability will extend beyond a reasonable time period." *In re M.M.*, 303 Ill. App. 3d 559, 566, 709 N.E.2d 259, 264 (1999). Therefore, a mere showing of mental impairment does not satisfy the statute. The State must show that the mental impairment renders the parent unable to discharge her parental responsibilities *and* that the inability will extend beyond a reasonable period of time. See *In re R.C.*, 195 Ill. 2d 291, 305, 745 N.E.2d 1233, 1242 (2001) (section 1(D)(p) does not allow a finding of unfitness based on a mere showing of mental impairment but also requires proof that the parent's mental condition renders her unable to discharge her parental responsibilities and that the inability will extend beyond a reasonable time period).

¶ 50    The court based its finding of unfitness under section 1(D)(p) on the 2008 evaluation report of Klug and the testimony of Kosmicki regarding his 2011 evaluation. Both Klug and

Kosmicki are licensed clinical psychologists. Both diagnosed Julia with PTSD and borderline intellectual functioning, and Kosmicki also diagnosed her with borderline personality disorder not otherwise specified. However, Klug did not testify. In March and April of 2008, when Klug evaluated Julia and prepared his report, the goal was to return S.L. to Julia within 12 months. Klug found that Julia's attention was good, that she was not easily distracted, that she was cooperative, and that she was oriented to time, place, and persons. He found her intellectual functioning to be low and her ability to learn limited, but he did not express an opinion that Julia suffered from a mental impairment that rendered her unable to discharge her parental responsibilities.

¶ 51    Kosmicki testified in February of 2012 that he did not believe that Julia was able to discharge parental responsibility at the time of his interview on April 18, 2011. He had not interviewed Julia or evaluated any additional reports or evidence since April 2011. Kosmicki testified that, when he interviewed Julia, she was oriented in all spheres and exhibited no evidence of any formal thought disorders. He said that she "became quite emotional" when she talked about the abuse she suffered in the past, but that did not seem unusual to him. He found her to be "mostly cooperative and pleasant to deal with."

¶ 52    Kosmicki explained that his testing showed Julia to be in the range of borderline or mildly mentally retarded. When asked his opinion regarding her prognosis, he testified, "My primary recommendation was at the time I saw her I didn't believe that she had the logistical stability in her life, home, work, those kinds of things or the emotional stability to manage the demands of caring for a child." He testified that he did not believe she would be able to discharge her parental responsibilities if S.L. had been returned to her the day after he interviewed her. When asked if his opinion was based on Julia's mental impairment, he testified that was part of the basis of his opinion, but that the larger factor in his conclusion was her past history because "the single best predictor of future behavior is history."

¶ 53    The only evidence concerning the issue of whether Julia's mental impairment rendered her incapable of discharging her parental responsibilities toward S.L. came from Kosmicki's written report and testimony. The essence of Kosmicki's testimony is that Julia suffered from a mental impairment and that he believed she could not discharge her parental responsibilities for S.L. at the time of the interview. However, he did not testify that it was her mental impairment that rendered her incapable of parenting S.L. Instead, he based his opinion that she was not capable of discharging her parental responsibilities primarily on her past history. Evidence of an inability to discharge parental responsibility based on a parent's past history is not equivalent to evidence of an inability to discharge parental responsibility based on the parent's current mental impairment.

¶ 54    During this time period, it is also relevant that Julia was adequately caring for M.P., that DCFS had found no reason to intervene to remove M.P. from Julia's custody, and that Kosmicki did not find any mental impairment sufficient to prevent Julia from discharging her parental responsibilities toward M.P. In fact, the trial court asked Kosmicki, "If she can adequately parent [M.P.], why can't she adequately parent [S.L.]?" When he replied, Kosmicki did not state that Julia's mental impairment rendered her incapable of discharging her parental responsibilities for either M.P. or S.L., but he only pointed out the differences in gender and age between the children. Under the facts of this case, we note that it is

-13-

illogical to believe that Julia suffered from a mental impairment severe enough to render her incapable of discharging her parental responsibilities for S.L., but that, at the same time, she was capable of discharging her parental responsibilities for M.P.

¶ 55    Since there is no other evidence of the first element of this statutory ground for unfitness, the trial court's finding that the State proved the first element of section 1(D)(p) is against the manifest weight of the evidence. The State's failure to prove the first element of the statute is fatal to a finding of unfitness on this ground because proof by clear and convincing evidence of both elements is necessary. *In re M.M.*, 303 Ill. App. 3d at 566, 709 N.E.2d at 264. Nevertheless, we will briefly discuss the evidence presented on the second element of the statute, which we also find lacking.

¶ 56    As to the second element of the statute, the State also failed to prove that there was sufficient justification to believe that Julia's inability to discharge her parental responsibilities would extend beyond a reasonable time. Kosmicki testified that before Julia could be reunited with S.L., she needed long-term intensive therapy. He acknowledged that she was in counseling and had been receiving mental health treatment when he met with her, but he did not know if the therapy was helping her. When asked how long he thought Julia would need to show that she was able to parent S.L., he testified that he believed she needed "six months to a year of logistical stability, being in one place, utilities, having a home, having no arrests, having no instance of domestic violence, [and] no substance abuse." Julia moved into a four-bedroom house with M.P. and Schroeter on July 22, 2011. The evidentiary hearing was conducted on February 24 and March 16, 2012. The trial court's order was entered on June 11, 2012.

¶ 57    At the time of the second day of the hearing, the evidence is undisputed that Julia had lived in the same residence, which DCFS deemed appropriate, for almost nine months. Julia was visiting with S.L. in this home, living there unsupervised with her son M.P., and for at least part of the time, also taking care of Schroeter's two daughters unsupervised on Sundays when Schroeter worked. During that time period, she had utilities, no arrests, no instances of domestic violence, and no substance abuse.

¶ 58    Additionally, the other evidence presented does not support a finding that the State proved the second element of section 1(D)(p). Every caseworker who testified acknowledged that Julia cooperated with their service requests throughout the case and after Kosmicki's evaluation. Kissner, the caseworker from the end of March 2011 through the date of the hearing, testified that Julia was meeting all of DCFS's requirements and that the only remaining problem was that, during visits, Julia lacked the appropriate level of interaction with S.L. However, Kosmicki did not base his opinion about Julia's inability to discharge parental responsibilities on her interaction with S.L., and he testified that he placed very little weight on the parenting assessment he conducted because Julia's interaction with S.L. had been limited. Kissner expressed concern about Julia's refusal to take medicine as prescribed, but by the time of the hearing, it was undisputed that she had voluntarily begun to take her prescriptions again until they caused an allergic reaction. The record also indicates that the medications that made Julia feel "like a zombie" and stop taking them were prescribed for bipolar disorder and obsessive-compulsive disorders, conditions that Kosmicki did not find when he evaluated Julia.

-14-

¶ 59     The only basis for the trial court's finding of unfitness on the second element of section 1(D)(p) is Kosmicki's testimony that Julia would need six months to a year of "logistical stability" to demonstrate that she had made sufficient changes to enable her to regain custody of S.L. However, at the time of the hearing, Julia had demonstrated every element of the "logistical stability" that Kosmicki found essential. Thus, the trial court's finding that the State proved the allegation of unfitness pursuant to section 1(D)(p) of the Adoption Act is against the manifest weight of the evidence and must be reversed.

¶ 60                                      CONCLUSION

¶ 61     For all of the reasons stated, the trial court's orders finding Julia unfit and terminating her parental rights are reversed, and this cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 62     Reversed and remanded.